(No. 53776.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. CHARLES SILAGY, Appellant.

*Opinion filed February 22, 1984.—Rehearing denied March 30, 1984.*

150

SIMON, J., concurring in part and dissenting in part.

Neil F. Hartigan, Attorney General, of Springfield (Michael B. Weinstein, Darrell Panethiere, and Jack Donatelli, Assistant Attorneys General, all of Chicago, of counsel), for the People.

Daniel D. Yuhas, Deputy Defender, and Lawrence Bapst, Charles M. Schiedel, and James G. Woodward, Assistant Defenders, of the Office of the State Appellate Defender, of Springfield, for appellant.

JUSTICE WARD delivered the opinion of the court:

On February 15, 1980, the defendant, Charles Silagy, was arrested in connection with the February 14, 1980,

murders of Cheryl Block and Anne Waters in Danville. He was later charged by information in the circuit court of Vermilion County with the commission of both murders. After a jury found him guilty of both crimes, he chose to represent himself at the sentencing hearing, made a confession in open court, and asked that the death penalty be imposed. The jury sentenced him to death, and he requested that the sentence be carried out without delay. The defendant waived the filing of a post-trial motion, but the circuit court appointed counsel to represent him on appeal. The defendant, through his counsel, has appealed directly to this court under the Constitution of Illinois (Ill. Const. 1970, art. VI, sec. 4(b)) and under our Rule 603 (87 Ill. 2d R. 603).

The bodies of Cheryl Block and Anne Waters, who were sisters, were discovered during the morning of February 14, 1980. Both women died as a result of massive hemorrhaging caused by multiple stab wounds. Acting on information supplied by his employer, Silagy was arrested in Louisville, Kentucky, the following day by Louisville police. Officers of the Vermilion County sheriff's office traveled to Louisville to return the defendant to Illinois. While there, they took and recorded a statement from the defendant in which he denied harming the women. The defendant later made another recorded statement.

According to the statements, the defendant, who lived in a trailer with Cheryl Block, his girlfriend, and her sister, Anne Waters, drove them to a male strip show at a local night club on the evening of February 13, 1980. Silagy spent the next two hours at a weekly meeting of the local chapter of Alcoholics Anonymous. He returned later to the club and talked with Rodney DeVaux. (At trial DeVaux testified that Silagy said "that he really didn't think that there was anything wrong [with the girls' attendance at the strip show] and he had

no objection to [Cheryl] being there." At one point in the conversation, DeVaux stated, the defendant "was talking about how much he loved this girl and he would not hurt her but that he would kill anybody who messed with her.") After the show ended, the defendant stated, he began to drink and got in an argument with Cheryl and Anne. He was asked to leave the club after slapping beer mugs and a pitcher off the table at which they were sitting. Two witnesses testified that Silagy was very apologetic about this as he left the club. He later returned to the club and offered to pay for the broken glassware. Silagy again argued with both Cheryl and Anne outside the club. DeVaux drove Anne home and Cheryl left with the defendant.

In his first statement at Louisville, Silagy told the police that he drove Cheryl to a different local tavern and left her there. He said he returned home, argued with Anne, and left the trailer without harming her.

In his second statement, the defendant said that he and Cheryl continued to argue as they drove to another tavern. As they did, he began to choke Cheryl. He continued:

"My truck done a spin-around, and killed itself, and I shut it off and started choking her some more, and kept choking her and a car come up from the south, and so I acted like we was making out, and the car was all clear, and I commenced choking her with my left hand, and than I decided I didn't have enough room, so I fought with the door for a little bit, and I got it open from the outside because it will not open from the inside. I had to crank the window down and all this time I still got a hold of her throat.

And so I throwed her out on the ground and I got outta the truck, and I started astomping on her and jumping up and down, on her head, and then I drug her across the road, and she was still breathing, so I took out my pocket knife and opened and pulled her coat and

blouse away, and stabbed her approximately five or six times in the chest on the left-hand side and then I left her lay there, and I went back and got into my truck and left."

Silagy then drove home, entered the trailer, locked the door, and started washing his hands and face when Anne knocked at the door. When Anne refused to leave, he "throwed her over toward the TV, and I, throwed her down, and her head hit the coffee table, and I went over, and kicked her a couple of times in the head. Then I proceeded to go to a drawer, to where the utensils were kept and I picked me out a knife that I knew would not bend, and I went back over and snatched her blouse on the left side and yanked it back, and stabbed her four times continuously in the chest."

Silagy quickly left the trailer after packing various personal items. He first drove to a local service station for gas. The attendant testified that the defendant "seemed real friendly, real happy" at the time. He continued on until "I saw some red lights down ahead of me *** and so I took a side road *** and went to my mother's house." He had an emotional conversation with his mother, he said, and both were crying when he left a short time later.

While driving towards Paris, Illinois, the defendant stopped "and plotted my route *** and I asked a trucker *** if he could give me directions to Louisville, Kentucky, and he did, and I took those instructions."

Robert Block, the defendant's employer, who was not related to Cheryl Block, received a phone call on February 14, 1980, at which the defendant asked that his paycheck be sent to him at a hotel in Louisville. Block gave this information to the local police. When arrested at the hotel by the Louisville police, Silagy was carrying two "ordinary pocket knives." Although very belligerent when first arrested, the defendant, according to the testimony of two detectives who interviewed him, responded to questions in

an intelligent manner and did not exhibit any unusual behavior while in custody.

At arraignment, the defendant pleaded not guilty by reason of insanity and demanded a jury trial. In various pretrial motions defense counsel requested that the prosecution be barred from asking potential jurors any questions pertaining to the death penalty, that the prosecution be compelled to disclose whether it would seek the death penalty, and that the death penalty statute be declared unconstitutional. The defendant challenged the discretion given the State's Attorney whether to seek the death penalty, the vagueness of the statute's provisions, and the absence of a reasonable-doubt standard regarding mitigating factors. The defendant's motions were denied. Sixty-nine prospective jurors were examined during *voir dire* and, over the defendant's objection, nine were excused from service for cause after the trial court found that they were unable to impose the death penalty under any circumstances.

At trial, witnesses appeared to support or attack the defendant's defense of insanity. Barbara Lister, the defendant's mother, testified to behavioral problems during his childhood. She testified that he was "very hard to control" and had a bad temper. She recalled episodes when her children were severely beaten by their drunken father at least once a week. After her divorce, the defendant, who was 13 at the time, was taken from his mother's custody because of her sexual promiscuity with a number of men. When Charles returned to her, Mrs. Lister testified that he was very unruly and raped his younger sister and raped the witness herself in 1966 and 1967.

Dr. Marvin Ziporyn, a psychiatrist who was called by the defendant as a witness, testified that he had examined Silagy in June 1980, and earlier in October 1976, concerning an unrelated incident. Based on his 1976 and 1980 examinations, and the defendant's history of physical violence and sexual assault, Dr. Ziporyn formed the opinion that Si-

lagy was "an extremely dangerous individual prone to acts of violence and sexual aggression against women." Ziporyn testified that Silagy suffered from extreme psychopathology, a mental disease he labeled "a psychoneurosis, specifically the subtype known as anxiety reaction or anxiety state," which could be activated by "external stress plus anything that would wipe out control of impulses such as drugs or alcohol." After listing a number of situations and stress factors that might have impaired Silagy's control system on February 14, 1980, Ziporyn concluded that a combination of these factors sent Silagy "off into a temporary psychotic state." He further testified that this condition could have lasted for hours or for as long as a week and consequently it would not be unusual for the defendant to engage in routine behavior after the deaths of the two women. He testified that loss of intellectual function and general awareness was not the issue, "it was a question of impulse control." The witness concluded his testimony by offering the opinion that at the time Cheryl Block and Anne Waters were killed, Silagy lacked the capacity to conform his conduct to the requirements of the law as a result of his mental disease.

Dr. Arthur Traugott, a psychiatrist in private practice who testified for the prosecution, also examined Charles Silagy concerning the events surrounding the deaths of Anne Waters and Cheryl Block. Dr. Traugott testified that from his examination and from background information he was of the opinion that Silagy "was able to appreciate the criminality of his acts" and possessed "the capacity to conform his behavior to society's dictates." Dr. Traugott noted several events which showed that Silagy could conform his behavior to usual standards: his ability to drive was not impaired, he behaved appropriately with the manager of the Club, and he was able to engage in conduct designed to avoid detection. Dr. Traugott concluded that Silagy suffered only from an antisocial personality disorder, which

was not a mental disease or defect. According to Dr. Traugott, the phrase "psychoneurotic anxiety state," the term employed by Dr. Ziporyn, was merely another way to describe someone who is anxious.

On cross-examination, Dr. Traugott admitted that past incidents of the defendant's behavior, which occurred in prison and in Vietnam, could have resulted from "reactive psychosis," a psychotic illness, which is triggered by a stressful event in someone's life, that may last for a period of up to two weeks. During the defendant's earlier incarceration, he was once carried screaming from the penitentiary dining room. He said he was taken to the infirmary and given medication. The defendant said he was later unable to recall this episode. The defendant claimed, rather improbably, that he had somehow obtained and destroyed his army medical records and there was no evidence to support his claim that he had a similar experience in Vietnam. Dr. Traugott further testified that something that might not be very stressful to an average person might be stressful enough to create a severe psychiatric episode in a mentally ill person. Dr. Traugott also acknowledged that the defendant told him that "once he had begun his course of action there was nothing that could stop him." But Dr. Traugott explained that this statement must be compared with the actions of the defendant, specifically with the event that, while he was choking Cheryl Block, he was able to pull her into a position to make it appear to an oncoming motorist that they were "making out." Dr. Traugott stated that the defendant's ability to remember the events surrounding the murders was significant because "we do have some evidence of what Mr. Silagy was like when he was psychotic and one medically has to compare his behavior and his memory of the events in question in light of the previous psychotic event."

Dr. Daniel Pugh, a psychiatrist, was appointed by the trial court on the defendant's motion for the purpose of ex-

amining the defendant. Based upon information given him, and upon an interview of the defendant, Dr. Pugh's opinion was that Silagy was under alcoholic intoxication at the time Cheryl Block and Anne Waters were killed. Dr. Pugh testified that he was "reasonably certain that Charles Silagy did have a substantial capacity to understand the nature of what he was doing and to conform his conduct to the law," and, although the defendant's intoxication impaired the control of his behavior, he felt the defendant still had a "substantial ability for control left."

On cross-examination, Dr. Pugh indicated that Charles Silagy also had a past history of acute reactive psychosis, a condition in which a person may, for brief periods of time, experience hallucinations, delusions, amnesia or very agitated combative behavior as a direct result of being put under very severe stress. Dr. Pugh recounted two episodes of the defendant's having experienced this psychosis: once while serving in Vietnam and again while he was in the custody of the Illinois Department of Corrections. Dr. Pugh then described the effect that combat duty in Vietnam may have had on the defendant's mental condition. He testified that the defendant had an unusually severe exposure to violence in Vietnam and said he had killed a number of the enemy in very violent ways. Dr. Pugh acknowledged that this exposure might make the defendant quite callous to violence and admitted that the defendant had more trouble controlling his impulses than did most people. In testifying to Silagy's level of control on the night of February 13, 1980, and the early morning of February 14, 1980, Dr. Pugh stated that the defendant "understood the seriousness of the assaults that he was committing." Dr. Pugh again testified that he did not think Silagy was suffering from a reactive psychosis on February 13th and 14th of 1980 because the defendant "did not have psychotic symptoms at that time; he was not hallucinating, he was not imagining things, he was not helpless to think or do things

and he remembered things that happened although his memory was somewhat fuzzy."

The defendant has advanced several constitutional objections to the death penalty statute (Ill. Rev. Stat. 1979, ch. 38, par. 9—1). Some of these have been rejected by this court in recent decisions and the defendant has not offered any convincing reasons to depart from those holdings. We have held that the statute is not unconstitutional in permitting the jury to consider nonstatutory aggravating factors during the second phase of the sentencing proceeding. (*People v. Williams* (1983), 97 Ill. 2d 252; *People v. Davis* (1983), 95 Ill. 2d 1, 38; *People v. Free* (1983), 94 Ill. 2d 378, 427.) We have also held that there is no constitutional violation in that the death penalty statute does not require the State to prove beyond a reasonable doubt the absence of mitigating factors sufficient to preclude imposition of that penalty. (*People v. Garcia* (1983), 97 Ill. 2d 58, 80-81; *People v. Free* (1983), 94 Ill. 2d 378, 421.) This court has rejected, too, the contention that the sentencing scheme in the statute is defective in that it fails to provide for the comparative review of capital cases (*People v. Williams* (1983), 97 Ill. 2d 252, 266; *People v. Kubat* (1983), 94 Ill. 2d 437, 502-04), and we have judged that the grant of discretion to the prosecutor in asking for the death penalty is not constitutionally improper (*People v. Davis* (1983), 95 Ill. 2d 1, 22; *People v. Szabo* (1983), 94 Ill. 2d 327, 351; *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531).

We do not find the defendant's other constitutional complaints against the statute convincing. He contends that the statute is unconstitutional in failing to require the prosecutor to disclose before trial an intention to seek the death penalty and that his right to the effective assistance of counsel was denied by this refusal of the State to disclose its intention after being asked by the defendant. The defendant says that his ignorance of the State's intention was prejudicial to him, because his counsel may have been

unwilling to rely on the insanity defense if he had known that the same jury deciding guilt would be deciding whether to impose the death penalty. Counsel might have been unwilling to rely on the insanity defense, he says, because in so doing they had to introduce evidence of his violent background, which could have influenced the jury at the sentencing stage.

A similar argument was advanced and rejected in *People v. Gaines* (1981), 88 Ill. 2d 342, 369. There, the defendant claimed that the omission in the death penalty statute of a requirement that the State disclose before trial its intention to seek the death penalty denied him the right to the effective assistance of counsel because that omission impaired the defendant's ability to decide whether to bargain for a negotiated plea and whether to demand or waive trial by jury. We held that to require that the State disclose its intention prior to trial would defeat the prosecutor's informed exercise of his discretion in requesting the penalty. We noted, too, that the defendant had not been misled into believing that the State would not ask for the death penalty, that defense counsel had assumed the State would do so, and that the fact that the indictment charged him with the commission of multiple murders and with murder in the course of another felony informed him that he could potentially be sentenced to death.

Here, as in *Gaines*, the defense was aware that the defendant could be sentenced to death, because otherwise there would not have been a request to the State to disclose its intention. We are not persuaded by the defendant's attempt to show that he was prejudiced by the State's not stating its intention. He does not contend that his attorneys declined to introduce relevant evidence at trial for fear of its possible misuse at a later sentencing hearing, and the defendant had not objected to having the jury that decided guilt also decide whether to impose the death penalty.

The defendant also challenges the statute on the ground of vagueness. The jurors were instructed that, in considering mitigating factors, they should consider the possible applicability of section 9—1(c)(2) of the Criminal Code of 1961, which sets out as a mitigating factor that "the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance, although not such as to constitute a defense to prosecution" (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(c)(2)). The defendant says that the lack of definition in the statute of the phrase "extreme mental or emotional disturbance" renders the statute unconstitutionally vague and lacking in the guidance for the jury made necessary by the eighth amendment (U.S. Const. amend. VIII).

Courts in other jurisdictions where the same mitigating factor appears in their statutes have dismissed similar claims of unconstitutional vagueness. (*State v. Dixon* (Fla. 1973), 283 So. 2d 1, 10; *State v. Holtan* (1977), 197 Neb. 544, 548, 250 N.W.2d 876, 880.) We are in agreement with those holdings.

The challenge to the mitigating factor here as being vague is not unlike the challenge to the mitigating factor in section 9—1(c)(1), which this court considered in *People v. Lewis* (1981), 88 Ill. 2d 129. It was contended there that the mitigating factor of the absence of a "significant history of prior criminal activity" was unconstitutionally vague. The contention was rejected, this court holding that the statutory language was a permissible means of calling the jury's attention to the absence of significant criminal convictions, and that mitigating factors need not be set out in the statute with the precision required for aggravating factors.

The defendant's final challenge to the statute is that the language of the mitigating factor we have just discussed, that the defendant was acting under the influence of "extreme mental or emotional disturbance," limits in an

unconstitutional fashion consideration of a defendant's impaired mental state causing mental or emotional disturbance that is not "extreme." He cites *Eddings v. Oklahoma* (1982), 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869, which held that a State cannot as a matter of law prohibit the consideration of any relevant mitigating evidence, and *Lockett v. Ohio* (1978), 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954, which held that a death penalty statute must allow the sentencing body to consider in mitigation any aspects of the defendant's character or record, and any of the circumstances of the offense the defendant points to in mitigation. The defendant says, on the basis of those decisions, that the jury must be permitted to consider evidence of any type of mental disturbance, extreme or otherwise, in determining the existence of a mitigating factor sufficient to preclude imposition of the death penalty.

The fallacy of the argument is that an accused is not limited as this defendant claims. The defendant is simply wrong in saying that the statute precludes consideration of any mental distress less than extreme. He overlooks that, while the act lists five mitigating factors, one of which is "extreme mental or emotional disturbance," the statute also provides in listing these factors: "Mitigating factors may include *but need not be limited to* the following [factors]." (Emphasis added.) Ill. Rev. Stat. 1979, ch. 38, par. 9—1(c).

The court instructed the jury in accordance with that provision. It told the jury that mitigating factors may include extreme mental or emotional disturbance or "any other facts or circumstances that provide reasons for imposing less than the most severe sentence." It appears from the record that the only reason the jury would not have considered any disturbance less than extreme disturbance was because of the defendant's own failure to argue that he was acting under the influence of such a disturbance. He told the jury, in fact, that he agreed with the

prosecutor's argument that at the time of the killing he was not acting under extreme emotional distress and urged the jurors to "put out of your mind[s]" the psychiatric testimony that had been offered in his behalf.

The defendant makes a number of claims of error occurring in the *voir dire*. These points, however, have been decided adversely to him in recent decisions of this court and need not be discussed at great length. We have held that the qualification of jurors under *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, according to which prospective jurors may be excused for cause if their views on the death penalty would require them to automatically vote against the imposition of that penalty regardless of the evidence, does not deny the defendant his right to a jury chosen from a fair cross section of the community. See *People v. Free* (1983), 94 Ill. 2d 378, 400-01.

We have consistently rejected, too, the contention that the examination of jurors pursuant to *Witherspoon* results in a conviction-prone jury. (*People v. Tiller* (1982), 94 Ill. 2d 303, 322; *People v. Gaines* (1981), 88 Ill. 2d 342, 358.) The defendant asks that this court make an exception, though, in cases where the defense relies upon the insanity defense. He cites simply Bronson, *On the Conviction Proneness and Representativeness of the Death-Qualified Jury: An Empirical Study of Colorado Veniremen*, 42 U. Colo. L. Rev. 1 (1970). This study was also presented in *People v. Carlson* (1980), 79 Ill. 2d 564, 586, where this court rejected as gratuitous the argument that a jury without scruples against capital punishment would be unfairly biased against finding an accused to be sane.

The defendant also challenges the exclusion of one of the prospective jurors as having been erroneous under *Witherspoon*. As stated, *Witherspoon* permits the exclusion for cause of a venireman who makes it clear that his views on capital punishment are so fixed that he would

vote against the imposition of the death penalty regardless of the evidence. *Witherspoon* does not permit, however, the exclusion of prospective jurors for cause because they express only general objections to or qualms regarding the death penalty.

The defendant says that the circuit court violated the holding in *Witherspoon* by excusing Mrs. June Clemmons, a prospective juror. The relevant part of the examination of Mrs. Clemmons was:

"THE COURT: I want to ask you a question as to your attitude towards the death penalty. Are your feelings towards the death penalty such that you could not vote to impose a death penalty under any circumstances regardless of the evidence presented?

A: I don't know how to say yes or no. I don't know if I actually could. I don't really believe someone should be killed, you know.

Q: *Would you vote not to impose the death penalty regardless of the circumstances, under any circumstances, regardless of the evidence?*

A: *I would say yes.*

Q: *In other words, you could never vote to impose the death penalty under any circumstances?*

A: *No, I don't think I could.*

Q: Regardless?

A: I don't think so.

THE COURT: Excuse this juror for cause?

STATE'S ATTORNEY: Yes.

DEFENSE COUNSEL [outside the hearing of the jury]: We would object to the excusal [*sic*] of this witness for cause on grounds previously stated for the other three jurors who were excused for cause because of their answers to the questions of the death penalty.

THE COURT: Mrs. Clemmons you will be excused." (Emphasis added.)

The State correctly argues that, even if any error in the exclusion of this prospective juror as to *Witherspoon* is to be assumed, it was waived. The defense's objection to the

exclusion of the juror, as quoted above, was based on the "grounds previously stated for the other three jurors who were excused for cause because of their answers to the questions of the death penalty." The ground stated by the defense in objecting to the other three jurors was not, however, that their examination did not elicit the proper opposition to the death penalty under the *Witherspoon* test. In fact, the defendant admits in his brief that "it appears from the record that [the other] veniremen were properly removed \*\*\*." Instead, the ground that defense counsel stated for objecting to the exclusion of those jurors was that defense counsel did not believe that any questions about the death penalty were appropriate during the *voir dire*, prior to a trial of the defendant's guilt. The defense did not believe that "the Witherspoon determination" was proper until the sentencing stage of the proceedings. (This contention was rejected by us in *People v. Gaines* (1981), 88 Ill. 2d 342, 357.) It is clear that a specific objection waives all grounds not stated. *People v. Williams* (1983), 97 Ill. 2d 252, 288; E. Cleary & M. Graham, Illinois Evidence sec. 103.2, at 6 (3d ed. 1979).

Even if the defendant had made proper objection, the examination of Mrs. Clemmons provided a basis for excusing her under *Witherspoon*. She expressed sufficiently clearly that her opposition to the death penalty would require her to vote against its imposition regardless of the evidence. We have held that "[t]he fact that a potential juror prefaces his answer with phrases like, 'I don't think' or 'I don't know' is not necessarily to be viewed as an expression of doubt or reservation. (*People v. Gaines* (1981), 88 Ill. 2d 342, 356.) *Witherspoon* does not prescribe a set catechism or require 'a venireman to express himself with meticulous preciseness.' (*People v. Gaines* (1981), 88 Ill. 2d 342, 356.)" (*People v. Kubat* (1983), 94 Ill. 2d 437, 499.) We have stated, too, that we must, in considering any alleged inconsistencies in the answers of a potential juror, "recog-

nize the superior position of the trial judge to ascertain the meaning which the venireman intends to convey." *People v. Gaines* (1981), 88 Ill. 2d 342, 357.

The defendant argues that his convictions should be reversed because the evidence was insufficient to prove that he was sane beyond a reasonable doubt at the time of the murders. Dr. Ziporyn testified that in his opinion the defendant was not able to conform his conduct to the requirements of the law during the early morning of February 14, 1980. That opinion, the defendant says, is corroborated by the undisputed fact that the defendant had previous episodes of psychotic behavior and by the severity of the defendant's assaults on Cheryl and Anne. A sane person, the defendant argues, would not have reacted so violently to the victims' minimal provocation.

Section 6—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 6—2) provides:

"(a) A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

(b) The terms 'mental disease or mental defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct."

There is a presumption that all persons are sane (*People v. Martin* (1980), 87 Ill. App. 3d 77), and in order to raise the affirmative defense of insanity, the defendant "must present some evidence thereon." (Ill. Rev. Stat. 1979, ch. 38, par. 3—2(a); see *People v. Redmond* (1974), 59 Ill. 2d 328, 336.) If the defendant introduces evidence sufficient to raise the affirmative defense, the State must sustain the burden of proving the defendant guilty by establishing beyond a reasonable doubt that the defendant was sane at the time of the offenses. (Ill. Rev. Stat. 1979, ch. 38, par. 3—2(b); *People v. Carlson* (1980), 79 Ill. 2d 564; *People v.*

*Clark* (1981), 102 Ill. App. 3d 414.) Whether the State carried its burden is a question of fact, and the jury's determination will not be reversed unless so improbable or unsatisfactory as to create a reasonable doubt as to the defendant's sanity (*People v. Carlson* (1980), 79 Ill. 2d 564, 580; *People v. Ward* (1975), 61 Ill. 2d 559) or so palpably erroneous as to suggest its basis as passion or prejudice (*People v. Clark* (1981), 102 Ill. App. 3d 414, 418; *People v. Kuhn* (1979), 68 Ill. App. 3d 59).

We consider that the evidence presented at trial supports the jury's decision that the State satisfied its burden. To counter the diagnosis of Dr. Ziporyn, the State presented Dr. Pugh and Dr. Traugott. Both of these physicians testified that, in their opinion, the defendant was not incapacitated by a mental disability to such a degree that he was deprived of substantial ability to understand the nature of his actions or to conform his conduct to the requirements of the law. That he had suffered previous episodes of psychotic behavior does not mean that he was under the same disability at the time of the killings. The manner in which he assaulted and killed the sisters is shocking and may indicate a mental abnormality, but it does not constitute proof of insanity in light of expert testimony to the jury that the defendant knew that what he was doing was wrong and that he was able to control his actions. There are portions of the defendant's own statement which support a conclusion that the defendant was not insane. Among them are that after his truck spun-out and the engine died, he turned off the ignition; that he pretended to be kissing Cheryl when he heard a car approach; that while he was struggling with Cheryl, he determined that he needed more room and that the door would not open from the inside; that he was able to roll the window down while holding on to Cheryl; that he immediately drove home, locked the door, and began washing her blood from his face and hands; that he intentionally selected a

knife which he knew would not bend with which to stab Anne; that he packed personal belongings before leaving the trailer; that he avoided approaching a police car; and that he was able to plot his route and follow directions to Louisville.

After all of the testimony had been received, the defendant's counsel requested that one of the jurors be removed by the court and replaced by one of the three alternate jurors. Defense counsel stated that she and "other individuals in the Courtroom" had observed the juror periodically dozing during the trial. She claimed that the juror "was about falling or leaning against the juror seated next to him." The trial court stated that it had seen "no evidence as stated by Defense Counsel." When asked why she had not previously called the juror's alleged inattentiveness to the court's and the prosecutor's attention, defense counsel acknowledged that she should have objected earlier.

Despite its expressed belief that the tardiness of the claim raised a question as to the sincerity of the request, the court examined the juror. The juror stated that he may have nodded once or twice for a period of seconds, but could not say that he fell asleep at any time during the course of the trial. He further stated that he did not think he had missed any of the testimony. The defendant's attorney did not question the juror and offered no evidence that the juror had fallen asleep. The court denied the motion to dismiss the juror.

The defendant now argues that he was denied the right to be tried by a jury of 12 competent persons who consider all of the evidence presented. He cites *United States v. Cameron* (3d Cir. 1972), 464 F.2d 333, and *United States v. Smith* (5th Cir. 1977), 550 F.2d 277, in arguing that the juror should have been replaced. In both of those cases it was said that a juror who cannot remain awake during much of a trial is unable to perform his duty. Here, not

only was it not shown that the challenged juror slept regularly during the trial, but the trial court found that the evidence was insufficient to prove that he was asleep at any time. On this issue there was only the defense counsel's allegation and the juror's own testimony that he had not missed any of the testimony. Despite her claim that others had seen the juror sleeping, the defense counsel did not present any testimony to support her claim. It cannot be said that the trial court abused discretion in denying the motion. Too, if the defendant or his attorney did see the juror sleeping, there was a duty to call it to the attention of the court at that time. (*United States v. Carter* (10th Cir. 1970), 433 F.2d 874, 876.) The failure to do so resulted in a waiver of the point. *People v. Nachowicz* (1930), 340 Ill. 480; *People v. Shockey* (1966), 66 Ill. App. 2d 245.

The defendant next contends that he was denied a fair trial when, on cross-examination, Dr. Ziporyn admitted that another psychiatrist, Dr. Clatteo, had earlier diagnosed the defendant as not being sexually dangerous. The defense objection to this testimony on the ground of hearsay was overruled. Admission of this testimony, the defendant argues, was prejudicial to his insanity defense and requires a new trial.

" 'Hearsay evidence is testimony in court or written evidence, of a statement made out of court, such statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter.' " (*People v. Carpenter* (1963), 28 Ill. 2d 116, 121; *People v. Rogers* (1980), 81 Ill. 2d 571; McCormick, Evidence sec. 246, at 584 (2d ed. 1972).) The admission concerning Dr. Clatteo's diagnosis at what was a substantially earlier time (in 1976) was elicited, not "to show the truth of matters asserted therein," but for the purpose of impeaching Dr. Ziporyn. Ziporyn had testified on direct examination that his diagnosis was based in part on previous reports concerning the defendant's

medical history. Despite Dr. Clatteo's earlier diagnosis, Dr. Ziporyn's opinion was that the defendant was sexually dangerous. The accuracy or truth of Dr. Clatteo's diagnosis had minimal if any relevance as to whether the defendant was sane at the time of the murders, since Dr. Clatteo's examination was in 1976. That the defendant had previously been diagnosed as not sexually dangerous was offered to show and did show that the previous medical reports on which Dr. Ziporyn in part formed his opinion were not clear, unequivocal and undisputed.

The defendant contends that he should be given a new trial because the jury heard testimony concerning prior episodes of his violent behavior without being given an instruction that no evidence had been received which tended to prove that the prior violent conduct had actually occurred. The testimony consisted of Dr. Pugh's recollection of his examination of the defendant. The defendant had related that, while serving in Vietnam, he had participated in torturing, interrogating and killing a number of the enemy. The testimony was given to show why Dr. Pugh reached his opinion of the defendant's psychiatric personality, and not as evidence of the defendant's being dangerous to society. But, the defendant says, at the sentencing hearing, the prosecutor claimed that the defendant's history of violence was an aggravating factor supporting imposition of the death penalty.

Our recent decision in *People v. Devin* (1982), 93 Ill. 2d 326, the defendant says, is pertinent. In *Devin*, we held that, under the extraordinary circumstances of that case, the introduction of the testimony of certain witnesses as to lurid statements by the defendant, without adequate limiting instructions regarding whether the statements were factual or not, was error. The testimony was that the defendant had talked on several occasions of various methods of torture, his familiarity with "contract killers," and his knowledge of how to kill and his enjoyment in having

done so. The psychiatrists in *Devin* were in agreement that the defendant had a sociopathic personality and frequently engaged in fantasies. Much of the criminal conduct of a sociopathic personality, they stated, resulted from efforts to carry out those fantasies.

Although there was no evidence corroborating the defendant's statements to Dr. Pugh, there was no evidence suggesting that the testimony was fantasy or unreliable. Unlike the situation in *Devin*, there was no medical testimony that the defendant was prone to engage in fantasy or to lie. Dr. Pugh considered the defendant's claimed recollection of Vietnam experiences in reaching a medical opinion and apparently accepted his statement. Even now the defendant does not claim that the events he claimed occurred in Vietnam did not happen.

During the first phase of the bifurcated sentencing hearing in which the jury determines whether the defendant was liable for the imposition of the death penalty, the People moved for the inclusion of all of the evidence presented at trial. The defendant had no objection and did not submit any additional evidence. The same motion was made by the People and allowed during the second phase of the hearing, in which evidence in aggravation and mitigation is presented. The defendant, after requesting to address the jury and after being sworn, confessed his guilt as to the murders involved here and to three previous unrelated crimes. (The crimes, of which he had been convicted, were aggravated battery against his mother in 1967, an attempted rape in 1970, and incest with his sister in 1972.) He asked the jury to ignore Dr. Ziporny's psychiatric testimony and to sentence him to death. The People urged the jury to sentence the defendant to death, considering that Dr. Pugh and Dr. Traugott were of the opinion that the defendant would continue to be a danger to society. The defendant then asked the jury to ignore the testimony of all three doctors and again requested that the death pen-

alty be imposed.

The defendant now claims that introduction of the physicians' testimony during the sentencing phase was a violation of his fifth amendment privilege against self-incrimination and of section 115—6 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1979, ch. 38, par. 115—6). Section 115—6 in part provides that, if a defendant raises the defense of insanity, statements that he made to court-appointed psychiatrists are admissible against him, but only on the issue of whether he was insane. The People point out, however, that the statutory provision which pertains specifically to the death penalty (Ill. Rev. Stat. 1979, ch. 38, par. 9—1) is free from any limitation but relevance in sentencing hearings in death penalty cases. (See *People v. Ruiz* (1982), 94 Ill. 2d 245.) Section 9—1(e) in part provides that during the sentencing hearing "[a]ny information relevant to any additional aggravating factors or any mitigating factors *** may be presented by the State or defendant regardless of its admissibility under the rules governing the admission of evidence at *criminal trials*. The State and the defendant shall be given fair opportunity to rebut any information received at the hearing." (Emphasis added.) (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(e).) In *People v. Free* (1983), 94 Ill. 2d 378, 422, we said: "Our statute clearly provides that the only finding necessary in determining the admissibility of evidence at the aggravation/mitigation phase is that the evidence be relevant." (See also *Woodson v. North Carolina* (1976), 428 U.S. 280, 49 L. Ed. 2d 944, 96 S. Ct. 2978.) We consider that the limitation of section 115—6 was not applicable to the sentencing hearing. The two statutes are to be read together, and we deem that the legislature intended that each was to be given effect.

Nor do we consider that the defendant's fifth amendment privilege against self-incrimination was violated. Both *Estelle v. Smith* (1981), 451 U.S. 454, 68 L. Ed. 2d 359,

101 S. Ct. 1866, and *Battie v. Estelle* (5th Cir. 1981), 655 F.2d 692, which are cited by the defendant, are distinguishable from the situation here. In those cases psychiatric testimony was introduced for the first time at the time of sentencing for the purpose of showing that the defendant would be dangerous in the future. The jury here had already heard the testimony of the three psychiatrists during the trial. To say that the defendant was prejudiced by reintroduction of their testimony during the hearing in aggravation and mitigation is not persuasive. Also different from this case, in *Smith* and *Battie* the trial courts compelled the defendant to undergo psychiatric examination for the purpose of determining whether he was competent to stand trial. Here the defendant requested the appointment of a medical expert to conduct a psychiatric examination. The record shows that the defendant was the first to specifically mention the psychiatric testimony during the sentencing hearing. The record also reveals that, after careful questioning by the trial court, although advised to the contrary by his legal counsel, the defendant stated that he had no objection to having all of the evidence received at trial admitted at the hearing. In light of the peculiar circumstances present here, we consider that the defendant has waived any objection he might otherwise make as to the admission of psychiatric testimony during the hearing. See *United States v. Cohen* (5th Cir. 1976), 530 F.2d 43; *People v. Free* (1983), 94 Ill. 2d 378.

The defendant argues now that, once it became apparent that he, acting as his own attorney, would not present any additional mitigating evidence at the sentencing hearing, the trial court should have reappointed counsel to present additional evidence on his behalf. Society's interest in maintaining the integrity of the sentencing process, the defendant argues, must take precedence over his personal right to represent himself in a criminal proceeding. The defendant also suggests that the extreme stress generated

by the trial may have triggered his anxiety neurosis, thus rendering him incompetent to make an intelligent waiver of counsel.

The defendant, during his February 19, 1980, statement to the police, first expressed and explained his wish to be put to death if convicted of the murders of Cheryl and Anne. At that time, he said:

"I just wanna lay down, man. You know I . . . if there are, you know, if they're gonna prosecute me on what I said, then I want . . . I wanna die. I don't need no *** hundred years. I don't want no *** time. I want death. *** I want the death penalty.

\* \* \*

*** I don't mean to hurt [my parents] and I love both of 'em. And I don't want to hurt no more. They suffered for twenty-nine years with [me]. I . . . went to the joint twice. The first time was for attempt rape, and the second time was incest and I . . . misused my whole . . . family. If my dad decided to punch me in the nose right now, I wouldn't blame him. *** And my mother decided to get up and smack me off this chair, that's fine with me. And I do not want to be a burden to nobody or nothing. No more, I'm done. I lived my life of hell and torture with me, I'm through. But I hurt nobody else."

At the conclusion of his statement, he stated that he had not been induced in any way to give the statement and that he had no complaint with the way he had been treated.

Immediately after the defendant had been found guilty of the offenses charged, he asked that he be allowed to proceed without counsel. The court allowed the defendant to reconsider his request overnight. The following day he again made the request and the court questioned the defendant. This examination included:

"THE COURT: Do you think you understand the severity of this, and do you understand what you are doing? Do you think you understand what the actual circum-

stances are?

THE DEFENDANT: Yes, sir.

THE COURT: You've thought about this for some time, have you?

THE DEFENDANT: Yes.

THE COURT: Have you discussed this with your attorney, that this is what you want to do?

THE DEFENDANT: Yes, I have very thoroughly.

THE COURT: And you feel this is the way you want to proceed?

THE DEFENDANT: Yes, sir.

THE COURT: Does Counsel have anything else that they think that this defendant should be apprised of?

COUNSEL: No, your Honor."

It was explained to the defendant that his attorneys would continue to sit at the counsel table and advise him as to how to proceed, but that all decisions would be made by him and that his attorneys would not address the court without the defendant's consent. The defendant's request to proceed without counsel was "due to the fact that their ethics of law, I would not ask them to go against their work. It was my decision to carry out what will happen." The defendant then stated that his decision was made freely and voluntarily without threats, promises, or coercion. The court made this finding:

"[t]hat the Defendant is a responsible person who is under no mental disability and who is knowingly, intelligently, and understandingly, electing to proceed in his defense as he suggested. The court further finds that the Defendant understands the nature of the charges for which he's been convicted, the seriousness of the possible penalties in the case, and has freely and voluntarily undertaken to act as his own attorney with assistance from his Counsel who are present at all times whenever he requested that Counsel for any assistance from them.

Do you have any objections to that statement, Mr. Silagy?

THE DEFENDANT: No, Your Honor.

THE COURT: That is a true statement?

THE DEFENDANT: It is a true statement.

THE COURT: At this time the Court will rule that the Defendant has a right to proceed as he has requested representing himself with his attorneys advising him in any respect he wishes. And the attorneys can participate and perform all the usual functions as Defense Counsel as requested by the defendant or not participate as directed by the Defendant from time to time."

The People then moved to incorporate all of the evidence received and findings made during the guilt phase of the trial. The defendant responded that he understood the motion, that he had no objection, and that he previously had consulted with his counsel regarding the motion.

At the sentencing hearing, the defendant did not present any evidence in mitigation and offered no objections to the People's presentation. The only additional evidence offered by the People in aggravation were certified copies of the defendant's three prior convictions. The defendant addressed the jury. After noting that he had twice served time in the penitentiary, he said:

"So I am well aware of the fact what lays in front of me. I have no desire to sit in no man's penitentiary. That's not a cop-out, and that's not a plea. What I am asking the jury is do not feel sympathy, feel empathy. \* \* \*

I do want the death penalty; and I will go to any lengths to have it served upon me."

The defendant asked that no mitigating factors be included in the court's instruction to the jury. Over his objection, the court *sua sponte* gave the following instruction:

"Mitigating factors may include that:

One, the murder was committed while the Defendant was under the influence of extreme mental or emotional disturbance although not such as to constitute a defense to prosecution;

Two, any other facts or circumstances that provide reasons for imposing less than the most severe sentence."

In his final remarks, the defendant told the jury to "judge alone on the two deaths, brutal deaths. Bring back the death penalty. Make me feel very good. *** Death is the end. Life imprisonment is like having cancer, slow way to die. I choose the death penalty over cancerous death ***."

The death penalty was imposed. The defendant then filed a statement with the court in which he stated that he didn't want a new trial, didn't want an appeal taken to any court and in particular to this court, and didn't want appellate counsel appointed. He asked that the sentence of death be carried out without delay. The court stated that the defendant could and had waived the filing of a posttrial motion, but held that the right to appeal to this court could not be waived (see Ill. Const. 1970, art. VI, sec. 4(b); 87 Ill. 2d R. 603). The court appointed counsel to represent the defendant on appeal.

We do not agree that the defendant's waiver of counsel should not have been accepted because the waiver frustrated the statutory intention to provide the sentencing body with all relevant mitigating evidence and this could best be done through counsel. It is clear that the sixth amendment to the Constitution of the United States (U.S. Const., amend. VI) provides for the right of self-representation in criminal proceedings. (*Faretta v. California* (1975), 422 U.S. 806, 45 L. Ed. 2d 562, 95 S. Ct. 2525; see also, Ill. Const. 1970, art. I, sec. 8.) The " 'right of a defendant to represent himself, when his choice is intelligently made, is as basic and fundamental as his right to be represented by counsel.' " (*People v. Nelson* (1971), 47 Ill. 2d 570, 574; *People v. Bush* (1965), 32 Ill. 2d 484, 487.) The Supreme Court, in *Faretta,* noted the "nearly universal conviction, on the part of our people as well as our courts, that forcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so." (422 U.S. 806, 817, 45 L. Ed. 2d 562, 572, 95 S. Ct. 2525, 2532.) Although a court may consider

his decision unwise, if it is freely, knowingly and intelligently made, that decision must be accepted out of "that respect for the individual which is the lifeblood of the law." *Illinois v. Allen* (1970), 397 U.S. 337, 350-51, 25 L. Ed. 2d 353, 363, 90 S. Ct. 1057, 1064 (Brennan, J., concurring).

The record shows that the trial court fully informed the defendant of the relevant substantive and procedural law involved. The defendant was informed of the possible sentencing alternatives. His decision was made after consultation with his attorneys. He was obviously aware of the possibility of being sentenced to death, since that was the punishment he requested. The record is clear that Silagy's decision to discharge his counsel was knowingly and intelligently made.

There is no suggestion that the defendant was suffering any impairment of reasoning ability at the time of his waiver of counsel. He showed understanding of the law, asked intelligent questions, and did not demonstrate any of the symptoms which he said had accompanied the disturbed episodes that he described. Dr. Ziporyn, who testified for the defendant, reported that he understood the nature of the charge and could cooperate with his attorney. The jury had found he was not insane at the time of the murders. The defendant's attorneys did not advise the trial court of any indication of an inability of the defendant to make a rational decision concerning the discharge of counsel, as the attorneys would have had a duty to do. The reasons the defendant expressed for discharging his attorneys and desiring a sentence of death were not irrational (he feared their ethical duty prevented them from carrying out his wishes to be given a death sentence, and he wished to be sentenced to death because of feelings of guilt and remorse, a desire to spare his parents from further agony because of his conduct, his dread of confinement in the penitentiary, and a desire to die with grace and dignity). There simply is no showing that Silagy was suffering un-

der a reactive psychosis at trial or was otherwise mentally incapable of making an intelligent waiver of counsel. We note, too, that even Dr. Ziporyn testified that the defendant did not suffer a loss of intellectual function during his periods of disturbance.

Nor do we consider, as the defendant says, that his decision to discharge his attorneys interfered with society's interest in the fair administration of justice. The sentencing body is required to give consideration to all mitigating facts in the trial record (*People v. Carlson* (1980), 79 Ill. 2d 564, 589-90) as well as to any mitigating evidence the defendant offers at the sentencing hearing (*People v. Lewis* (1981), 88 Ill. 2d 129, 144). In *Lewis*, this court noted that in some instances a defendant may choose not to present evidence during the sentencing phase in aggravation and mitigation. 88 Ill. 2d 129, 147; see Johnson, *The Death Row Right to Die: Suicide or Intimate Decision?*, 54 S. Cal. L. Rev. 575 (1981).

Society's interest in the proper administration of justice is preserved by giving a defendant the right freely to present evidence in mitigation, by requiring the sentencing body to find aggravating factors before imposing the death penalty, and by requiring that a sentence of death be reviewed by this court. These practices are to assure that the death penalty will not be imposed arbitrarily.

Here the sentencing jury was the same jury that had heard the evidence at trial. It was not without any evidence which it could consider in mitigation. The jury was made aware of the defendant's personality disorder, Dr. Ziporyn's opinion that the defendant could not control his conduct, the defendant's problem childhood, his stressful military service in Vietnam, the fact that the defendant had been employed at the time of the murders, and the defendant's remorse. The defendant does not claim that there was any additional evidence which might have been presented in mitigation. Without showing that some rele-

vant mitigating evidence was withheld from the jury, the defendant cannot show that he was prejudiced by being allowed to represent himself at the sentencing hearing. A conviction or sentence imposed will not be set aside unless the error claimed is shown to be prejudicial. *People v. Warmack* (1980), 83 Ill. 2d 112, 129; *People v. Scarpelli* (1980), 82 Ill. App. 3d 689, 697; see also *People v. Tranowski* (1960), 20 Ill. 2d 11, 17.

The defendant argues that his waiver of counsel was not knowingly and understandingly made because the trial court failed to inform him that a jury other than the one which found him guilty could be impaneled for good cause shown. (See Ill. Rev. Stat. 1979, ch. 38, par. 9—1(d)(2)(c).) He suggests that his allegations that a juror fell asleep and that he was confused as to the difference between the concepts of "insanity" and "extreme emotion or mental disturbance" constituted "good cause" for the impaneling of a different jury.

Our Rule 401(a) specifies the admonitions required to be given by the trial court before a defendant can be said to have understandingly waived the assistance of counsel. (87 Ill. 2d R. 401(a).) Under the rule the defendant must be informed of:

"(1) the nature of the charge;

(2) the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences; and

(3) that he has a right to counsel and, if he is indigent, to have counsel appointed for him by the court."

The record shows that the court's admonitions to the defendant were detailed and clear. Rule 401(a) does not require that the defendant be informed that a new jury could be impaneled for good cause. As set out earlier in this opinion, his allegations of a sleeping juror are not supported in the record and therefore do not constitute good

cause for convening a new jury. Too, the defendant's appointed counsel remained nearby so as to assist and advise the defendant concerning substantive or procedural law. The defendant admitted that his attorneys had explained his involved legal rights and procedures and had advised how he should proceed. The record reflects that the defendant's waiver of counsel was knowingly and understandingly made.

Finally, the defendant suggests that the sentence of death should be vacated because the evidence did not warrant that penalty. He refers to his long-term mental problems, a difficult childhood, his period of combat in Vietnam, and his genuine remorse. He compares his situation to those in *People v. Gleckler* (1980), 82 Ill. 2d 145, *People v. Carlson* (1980), 79 Ill. 2d 564, and *People v. Walcher* (1969), 42 Ill. 2d 159, where each defendant's death sentence following convictions for one or more murders was either vacated or reduced on direct appeal. In *Carlson* and *Gleckler*, the defendants had no criminal histories and this court noted that there was little chance that the defendants would again prove dangerous to society. In addition, Gleckler had the "personality of a doormat" and there was evidence of compulsion. Carlson's subsequent actions showed great concern about the future of his children. In *Walcher*, the defendant, who was a chronic alcoholic, had been drinking prior to his killing of a liquor-store owner. His extensive arrest record involved misdemeanors such as disorderly conduct, vagrancy, trespassing, and window peeping. Many were related to his drinking problem. In contrast, Silagy's criminal record contained convictions for aggravated battery, attempted rape, and incest. He had assaulted and raped both his sister and his mother and had served approximately seven years in the penitentiary. The offenses involved here are the deliberate, violent murders of two women.

Key elements of a judgment to execute a defendant are

the nature of the crime and the character of the defendant. (*Roberts v. Louisiana* (1976), 428 U.S. 325, 334, 49 L. Ed. 2d 974, 982, 96 S. Ct. 3001, 3006; *People v. Gleckler* (1980), 82 Ill. 2d 145, 162.) We cannot say, considering the evidence, that the death penalty was unwarranted.

For the reasons given, the judgment of the circuit court of Vermilion County, including the death sentence, is affirmed. The clerk of this court is directed to enter an order setting Friday, September 21, 1984, as the date on which the sentence of death entered in the circuit court of Vermilion County is to be executed. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 119—5). A certified copy of this order shall be furnished by the clerk of this court to the Director of Corrections, to the warden of Stateville Correctional Center and to the warden of the institution wherein the defendant is confined.

*Judgment affirmed.*

JUSTICE SIMON, concurring in part and dissenting in part:

I concur in the majority's judgment that the defendant's convictions of murder should be affirmed, but I dissent from the decision to impose the death penalty. The Illinois death penalty statute is unconstitutional, and even if it were not, a new death penalty hearing is required in this case because the trial court should have ordered the defendant's standby counsel to address the jury on the mitigating factors in the defendant's case when the defendant, acting as his own counsel, refused to do so. In addition, statements made by the defendant to court-appointed psychiatrists should have been excluded from the death penalty proceeding.

I. The Illinois Death Penalty Statute is Unconstitutional

The situation in Illinois concerning the constitutionality

of our death penalty statute is an anomaly. A majority of four of the present justices have said and continue to adhere to the view that they believe the statute is unconstitutional because it allows prosecutors too much discretion in choosing whether to seek the death penalty and that this may result in arbitrary application of the statute. (See *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 544 (Ryan, J., Goldenhersh, C.J., and Clark, J., dissenting); *People v. Lewis* (1981), 88 Ill. 2d 129, 179 (Simon, J., dissenting).) Three of these justices, however, relying on the doctrine of *stare decisis,* have refused to follow their previously dissenting viewpoint after four other members of the court, one of whom (Justice Thomas E. Kluczynski) is no longer a member, ruled in favor of the constitutionality of the statute. (See *People v. Lewis* (1981), 88 Ill. 2d 129, 165 (Goldenhersh, C.J., concurring), 166 (Ryan, J., concurring), 167 (Clark, J., concurring).) This situation involving, as its does, both a constitutional question and the death penalty, is remarkable in the history of American jurisprudence.

In *Lewis* I expressed my views on the proper application of *stare decisis* in cases involving the Constitution and the death penalty. Justices of courts of last resort traditionally have adhered to their positions on important issues of constitutional interpretation even though the court has previously resolved the issue to the contrary; a change in the membership of a supreme court has often permitted the court to reverse a prior constitutional construction. I believe that these traditions are fundamental to the American system of justice, and that the application of *stare decisis* in this posture violates due process of law guaranteed by the State and Federal constitutions (Ill. Const. 1970, art. I, sec. 2; U.S. Const., amend. XIV, sec. 1). A person should not be put to death in order to perpetuate the doctrine of *stare decisis.*

The practice and experience of the United States Supreme Court in addition to those of this court I referred to

in my dissent in *Lewis* illustrate these traditions. In *Smith v. Allwright* (1944), 321 U.S. 649, 665, 88 L. Ed. 987, 998, 64 S. Ct. 757, 765, Justice Reed wrote in the majority opinion:

> "[W]e are not unmindful of the desirability of continuity of decision in constitutional questions. However, when convinced of former error, this Court has never felt constrained to follow precedent. In constitutional questions, where correction depends upon amendment and not upon legislative action this Court throughout its history has freely exercised its power to reexamine the basis of its constitutional decisions. This has long been accepted practice, and this practice has continued to this day." (Footnotes omitted.)

A footnote to this passage cites a long list of United States Supreme Court decisions that had been overruled.

In *West Virginia State Board of Education v. Barnette* (1943), 319 U.S. 624, 87 L. Ed. 1628, 63 S. Ct. 1178, the court overruled *Minersville School District v. Gobitis* (1940), 310 U.S. 586, 84 L. Ed. 1375, 60 S. Ct. 1010, a case decided only three years before. In *Barnette* the new majority was made when two new justices, Jackson and Murphy, joined the court, and two justices, Black and Douglas, changed their minds. Chief Justice Stone, who had dissented in *Gobitis*, adhered to his position in *Barnette*, allowing his interpretation of the Constitution to prevail.

In *Erie R.R. Co. v. Tompkins* (1938), 304 U.S. 64, 82 L. Ed. 1188, 58 S. Ct. 817, the United States Supreme Court overruled *Swift v. Tyson* (1842), 41 U.S. (16 Pet.) 1, 10 L. Ed. 865, and abolished the Federal common law in diversity actions. Writing for the court, Justice Brandeis recognized the special problem in applying *stare decisis* to constitutional questions:

> "If only a question of statutory construction were involved, we should not be prepared to abandon a doctrine so widely applied throughout nearly a century. But the

unconstitutionality of the course pursued has now been made clear and compels us to do so." 304 U.S. 64, 77-78, 82 L. Ed. 1188, 1194, 58 S. Ct. 817, 822.

In *Harper v. Virginia State Board of Elections* (1966), 383 U.S. 663, 16 L. Ed. 2d 169, 86 S. Ct. 1079, Justice Douglas wrote the majority opinion striking down the Virginia poll tax under the equal protection clause even though the same Virginia tax had been upheld in *Butler v. Thompson* (1951), 341 U.S. 937, 95 L. Ed. 1365, 71 S. Ct. 1002, over Justice Douglas' dissent. In *Harper* there was a strong dissent by Justice Black, who noted that he was a member of the majority in *Butler*. The main argument in his dissent, however, speaks to the merits of the constitutional issue, and not to Justice Douglas' adherence to his position on an important issue of constitutional interpretation. See also *United States v. Darby* (1941), 312 U.S. 100, 115, 85 L. Ed. 609, 618, 61 S. Ct. 451, 458 (overruling *Hammer v. Dagenhart* (1918), 247 U.S. 251, 62 L. Ed. 1101, 38 S. Ct. 529, and adopting the view of "the powerful and now classic dissent [in that case] of Mr. Justice Holmes").

The predominant view on the proper role of *stare decisis* in constitutional interpretation is expressed by the younger Justice Harlan in his separate opinion in *Oregon v. Mitchell* (1970), 400 U.S. 112, 152, 27 L. Ed. 2d 272, 297, 91 S. Ct. 260, 279 (Harlan, J., concurring in part and dissenting in part), a case involving the constitutionality of congressional legislation reducing the voting age and residency requirements for State and Federal elections:

"The consideration that has troubled me most in deciding that the 18-year-old and residency provisions of this legislation should be held unconstitutional is whether I ought to regard the doctrine of *stare decisis* as preventing me from arriving at that result. \*\*\*

After much reflection I have reached the conclusion that I ought not to allow *stare decisis* to stand in the way

of casting my vote in accordance with what I am deeply convinced the Constitution demands. \*\*\* Concluding, as I have, that such decisions cannot withstand constitutional scrutiny, I think it is my duty to depart from them, rather than to lend my support to perpetuating their constitutional error in the name of *stare decisis*." (400 U.S. 112, 218-19, 27 L. Ed. 2d 272, 334-35, 91 S. Ct. 260, 311-12.)

Justice Harlan had dissented in the case he refused to follow in *Oregon v. Mitchell. Cf. Baldwin v. New York* (1970), 399 U.S. 66, 118, 26 L. Ed. 2d 437, 464, 90 S. Ct. 1886, 1915 (Harlan, J., dissenting) ("I cannot, in a matter that goes to the very pulse of sound constitutional adjudication, consider myself constricted by *stare decisis*").

The experience of the United States Supreme Court in applying *stare decisis* reflects the predominant tradition in American jurisprudence that precedent is neither controlling on nor compelling to the justices of a supreme court when the questions to be decided are constitutional. This tradition should be especially relevant in the context of the death penalty, which is the most extreme and irreversible punishment that western civilization can impose. The situation we face is that, as recently as two years ago, four justices of this court acknowledged their belief that the Illinois death penalty statute is unconstitutional. (See *People v. Lewis* (1981), 88 Ill. 2d 129, 165-67.) I believe it is a violation of due process to execute a person on the basis of a statute that a majority of this court currently believes is unconstitutional, but that three justices making up that majority support only because of the doctrine of *stare decisis*.

## II. The Trial Court Should Have Requested the Defendant's Standby Counsel to Present and Argue Mitigating Evidence to the Sentencing Jury

The defendant's preference for the death penalty is not

a relevant concern in deciding whether he should be put to death for the brutal murders he committed. Even though the defendant waived the right to counsel at his sentencing proceeding, the trial court should have requested the defendant's standby counsel to present and argue the mitigating evidence to the jury when it became apparent that the defendant would not do so.

The proper and orderly consideration of mitigating evidence is crucial to the death penalty proceeding because it allows the jury to make an individualized assessment of the propriety of the death penalty in each case. Besides, it ensures that the death penalty will not be imposed in cases where circumstances indicate that a less severe penalty is warranted. (*Cf. Lockett v. Ohio* (1978), 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954; *Roberts v. Louisiana* (1977), 431 U.S. 633, 52 L. Ed. 2d 637, 97 S. Ct. 1993.) The Illinois death penalty statute accordingly requires that "[t]he court *shall* consider or *shall* instruct the jury to consider any *** mitigating factors which are relevant to the imposition of the death penalty." (Emphasis added.) (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(c).) This cannot occur when the defendant prevents the sentencing body from receiving evidence relevant to the issue. In such cases there are no safeguards to prevent arbitrary application of the death penalty.

When a defendant in a capital case assumes his own defense in his sentencing hearing so that he can seek the death penalty, he also deprives this court of its crucial role in promoting "the evenhanded, rational, and consistent imposition of death sentences under law." (*Jurek v. Texas* (1976), 428 U.S. 262, 276, 49 L. Ed. 2d 929, 941, 96 S. Ct. 2950, 2958.) Section 9—1(i) of the Criminal Code of 1961 provides that "[t]he conviction and sentence of death *shall* be subject to automatic review by the Supreme Court." (Emphasis added.) (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(i).) In *People v. Brownell* (1980), 79 Ill. 2d 508, 541, this court

held that the automatic-appeal provision was sufficient "to prevent the arbitrary imposition of the death penalty." The refusal by the defendant to make any record in the sentencing hearing that can provide a basis for his automatic appeal denies this court any meaningful role in the State's decision to impose the death penalty and turns our reviewing role into a sham. In requiring an automatic appeal of a death sentence, the legislature undoubtedly decided that this procedure was essential to the fairness and rationality of the death sentencing process, and it cannot be waived. In order to give effect to this decision we should not allow capital defendants to represent themselves in their sentencing hearing when they elect to seek their own execution.

In this case the defendant was twice allowed to address the jury in the sentencing hearing, first as a sworn witness and then in his closing statement. Each time he emphasized that he had been in prison before and did not wish to return. He noted that he had "brutally caused the death of two young ladies." He told the jury, "I do want the death penalty; and I will go to any lengths to have it served upon me"; and he urged the jury, to "[B]ring back the death penalty. Make me feel very good." In addressing the jury in his closing statement the prosecutor only reinforced the defendant's plea.

In asking for the death penalty the defendant appropriated to himself a judgment that only society can properly make. When the defendant refused to present or argue any mitigating factors to the jury, the trial court should have ordered the defendant's standby counsel to do so.

The majority claims that this procedure would have violated the defendant's right to represent himself in criminal proceedings which is protected by the sixth amendment. (*Faretta v. California* (1975), 422 U.S. 806, 45 L. Ed. 2d 562, 95 S. Ct. 2525.) However, the right to self-representation recognized in *Faretta* is not unlimited. Surely we may deny a capital defendant the opportunity to argue himself

the merits of his case before this court. (*Cf. Jones v. Barnes* (1983), 463 U.S. 745, 77 L. Ed. 2d 987, 103 S. Ct. 3308 (A criminal defendant has no constitutional right to compel his appointed counsel to argue nonfrivolous issues which counsel has decided to waive in the exercise of his professional judgment).) "Moreover, the trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct \*\*\* [and] a State may—even over objection by the accused—appoint a 'standby counsel' to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary." (*Faretta v. California* (1975), 422 U.S. 806, 834-35 n.46, 45 L. Ed. 2d 562, 581 n.46, 95 S. Ct. 2525, 2541 n.46.) In any event, nothing in *Faretta* or any other United States Supreme Court case suggests that the defendant may use his right of self-representation to make a mockery of his death penalty hearing by refusing to argue whether special circumstances exist which prohibit imposition of the death penalty in a civilized society.

In *People v. Burson* (1957), 11 Ill. 2d 360, this court explicitly recognized that under limited circumstances the State does have the power to compel the defendant to accept counsel for his defense:

"[T]he defendant, upon the waiver of counsel, had the right to defend himself, subject to the constant duty of the court to protect the judicial process from deterioration occasioned by improper or inadequate conduct of the defense. *In such situation the court possesses broad discretion in relation to the appointment of counsel* for advisory or other limited purposes, or *to supersede the defendant in the conduct of the defense*. Continuous supervision of the trial is required in order to maintain proper judicial decorum, to the end that defendant may receive a fair trial." (Emphasis added.) (11 Ill. 2d 360, 373.)

In the present case the trial court should have exercised this power.

The majority offers no explanation for its holding that the defendant's right to represent himself is greater than society's interest in ensuring that the death penalty is only imposed rationally and consistent with our values and traditions. Indeed, the predominant weight of authority from other States is to the contrary. *E.g., People v. Chadd* (1981), 28 Cal. 3d 739, 751, 621 P.2d 837, 844, 170 Cal. Rptr. 798, 805 ("Nothing in *Faretta*, either expressly or impliedly, deprives the state of the right to conclude that the danger of erroneously imposing a death sentence outweighs the minor infringement of the right of self-representation resulting when defendant's right to plead guilty in capital cases is subjected to the requirement of his counsel's consent").

In *Commonwealth v. McKenna* (1978), 476 Pa. 428, 383 A.2d 174, the Pennsylvania Supreme Court held that defendants sentenced to death could not waive the automatic-appeal provision in the Pennsylvania death penalty statute:

"[W]hile a defendant may normally make an informed and voluntary waiver of rights personal to himself, his freedom to do so must give way where a substantial public policy is involved; ***.

*** It is evident from the record that Gerard McKenna personally prefers death to spending the remainder of his life in prison. While this may be a genuine conviction on his part, the waiver concept was never intended as a means of allowing a criminal defendant to choose his own sentence. Especially is this so where, as here, to do so would result in state aided suicide. The waiver rule cannot be exalted to a position so lofty as to require this court to blind itself to the real issue—the propriety of allowing the state to conduct an illegal execution of a citizen." 476 Pa. 428, 440-41, 383 A.2d 174, 181.

This court implicitly adopted the same position when we

denied the defendant's motion in this case to discharge his appointed counsel and to dismiss his appeal, and I believe that the conclusion it reaches in this case is inconsistent with that position. (Accord, *People v. Stanworth* (1969), 71 Cal. 2d 820, 834, 80 Cal. Rptr. 49, 58-59, 457 P.2d 889, 898-99 (" 'Although a defendant may waive rights which exist for his own benefit, he may not waive those which belong to the public generally,' " quoting *People v. Werwee* (1952), 112 Cal. App. 2d 494, 500, 246 P.2d 704, 708).) Is it not anomalous for this court to approve of the defendant's appearance before the sentencing court without the advice of counsel, when it required the defendant, over his objection, to have counsel in his appeal to this court?

The courts of this State should not permit a defendant in a capital case to represent himself when his only purpose is to seek his own conviction and a sentence of death, and his conduct, if permitted to represent himself, should not be regarded as a waiver of rights. I believe the majority erred in holding that the defendant in this case could waive proper process in the sentencing hearing. See *The Death Row Right to Die: Suicide or Intimate Decision?* 54 S. Cal. L. Rev. 575, 628 n.334 (1981).

In *State v. Shank* (La. 1982), 410 So. 2d 232, the Louisiana Supreme Court held that under circumstances similar to this case trial counsel should be appointed over the defendant's objections and that this procedure would not violate the defendant's right to self-representation:

"A defendant has a federal constitutional right of self-representation and may proceed to defend himself without counsel when he voluntarily and intelligently elects to do so. *Faretta v. California* (1975), 422 U.S. 806, 45 L. Ed. 2d 562, 95 S. Ct. 2525. In the present case, however, unlike Faretta, the defendant has no complaint about the competence, diligence or workload of his two court appointed attorneys. Instead, his motivation for electing to represent himself is that he wishes to be found guilty of first degree murder *and* sentenced to death. In effect, he

requests that he be allowed to defend himself because he fears that the lawyers appointed to represent him will be effective advocates and obtain an acquittal or a sentence of less than death ***.

When an accused manages his own defense, he relinquishes many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must 'knowingly and intelligently' forego those relinquished benefits. *Faretta v. California, supra; Johnson v. Zerbst* (1938), 304 U.S. 458, 82 L. Ed. 1461, 58 S. Ct. 1019 ***. [A] defendant's election to represent himself for the purpose of acquiescing in his conviction of a capital offense and in his death sentence cannot be sanctioned as an intelligent choice." (410 So.2d 232, 233.)

This position comports with the procedures established by the Illinois death penalty statute; the majority's failure to adopt it renders the application of the death penalty in this case arbitrary, irrational and in violation of the eighth amendment to the United States Constitution.

### III. The Defendant's Statements to Court-Appointed Psychiatrists Should Have Been Excluded at the Death Penalty Hearing

When circumstances indicate that a defendant may rely on a defense of insanity, the Code of Criminal Procedure of 1963 provides that the trial court may order the defendant to submit to examination by a court-appointed psychiatrist. The Code, however, also provides that statements made by the defendant to the court-appointed psychiatrists "shall not be admissible against the defendant unless he raises the defense of insanity *** *in which case they shall be admissible only on the issue of whether he was insane ***."* (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 38, par. 115– 6.) This limitation obviously is designed to protect the defendant against compelled self-incrimination and to encourage him to communicate freely with the court-ap-

pointed psychiatrist.

In this case the defendant made various statements to three court-appointed psychiatrists which were admitted at the death penalty hearing. The prosecution relied on them, not to prove the defendant's sanity, but to show among other things that he is "an incredibly violent man who has a very, very bad temper." Under section 115—6, these statements should have been excluded at his death penalty hearing, even though they were admitted at his trial. The failure to exclude them requires that we vacate the death penalty and remand for a new sentencing hearing.

The majority avoids this result by relying on section 9—1(e) of the Criminal Code of 1961, which provides that during the sentencing hearing "any information relevant to any *** aggravating factors or any mitigating factors *** may be presented by the State or defendant regardless of its admissibility under the rules governing the admission of evidence at criminal trials." (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(e).) This provision, however, was primarily designed to ensure that evidence of the defendant's character is admissible in the death penalty hearing. Such evidence, although ordinarily inadmissible at a criminal trial, is relevant to the sentencing decision. Section 9—1(e) should not be read, however, to abrogate evidentiary privileges like section 115—6, which are designed to foster free and open communication by ensuring the confidentiality of the communication or by limiting uses of the communication that are adverse to the defendant's interest. Certainly no one would contend that section 9—1(e) overrides the attorney-client privilege, the physician-patient privilege or the spousal communication privilege.