2020 IL App (1st) 172644-U

THIRD DIVISION
December 23, 2020

No. 1-17-2644

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 09884 |
| | ) | |
| TIMOTHY RELIFORD, | ) | Honorable |
| | ) | Nicholas R. Ford, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Howse and Justice Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) The trial court did not abuse its discretion by allowing defendant to represent himself at a fitness hearing where no *bona fide* doubt as to defendant's fitness was raised: (2) the trial court's finding that defendant was fit to stand trial and represent himself was not against the manifest weight of the evidence; (3) the trial court acted within its discretion in directing defendant to pass exhibits through a deputy to the victim during cross-examination; and (4) the trial court did not abuse its discretion in terminating defendant's repetitive cross-examination and denying defendant's request to recall the victim to testify.

¶ 2    Defendant Timothy Reliford waived his right to counsel and represented himself at his

April 2017 jury trial for the aggravated criminal sexual assault of J.H. Following the trial, the

jury found defendant guilty of the charged offense and the trial court subsequently sentenced defendant to a term of 16 years in the Illinois Department of Corrections.

¶ 3    On appeal, defendant argues that the trial court erred: (1) in allowing defendant to represent himself at a fitness hearing; (2) in finding defendant fit to stand trial and to represent himself; (3) by requiring defendant to pass exhibits to J.H. through the courtroom deputy; and (4) by terminating defendant's cross-examination of J.H. in violation of defendant's sixth amendment confrontation rights.

¶ 4    In June 2016, defendant was charged with three counts of aggravated criminal sexual assault (720 ILCS 5/11-1.30 (West 2014)) and two counts of aggravated battery (720 ILCS 5/12-3.05 (West 2014)). At the July 7, 2016 hearing, defendant appeared *pro se*, waived the formal reading of the charges, and pled not guilty. The trial court admonished defendant about choosing to waive counsel and represent himself. During the discussion, defendant disclosed that he was 32 years old, he graduated from high school and had attended some college. Defendant indicated that he was representing himself on another pending case. Defendant stated that he had been to prison twice and was familiar with the legal proceedings. The court explained the risks of defendant representing himself and defendant responded that he understood. The court asked defendant if he understood: presenting a defense required adherence to various rules governing the trial; a lawyer has substantial experience and training in trial procedure and the prosecution will have an experienced attorney; a prosecutor may have an advantage when defendant may fail to object to inadmissible evidence; defendant may not make effective usage of his right to *voir dire* the jurors; defendant may make tactical decisions that produce unintended consequences; defendant will not be allowed to complain on appeal about his own ability to defend himself; defendant may have the effectiveness of his defense diminished by defendant acting as both

attorney and the defendant; defendant will not receive special consideration from the court; and defendant will not receive extra time to prepare or access to the law library. Defendant responded to the court that he understood each of these admonishments. The court also asked defendant if he understood that the court was not going to appoint standby counsel. The court explained the sentencing range to be 6 to 30 years upon conviction.

¶ 5     Also in July 2016, defendant sent a letter to the clerk of the Cook County Circuit Court stating, "this is a suicide letter that says if [defendant] doesn't receive a change of venue & be treated fairly by the next court date of 07-28-16, then [defendant] will seriously end his life." The letter continued by stating that the trial judge "disrespected" defendant and violated defendant's due process rights by declining to appoint a second chair to assist defendant. Defendant also complained about the judge's failure to hear defendant's motions and defendant believed that the judge and assistant State's Attorney (ASA) were "working together to convict him ***." Defendant asserted that he "doesn't need a psych evaluation at all."

¶ 6     At the July 22, 2016 hearing, the trial court stated, "My understanding [defendant] forwarded to the clerk's office [an] indication he's going to take his own life. He represents himself. I want to prepare a BCX [behavioral clinical examination] for fitness and sanity."

¶ 7     On July 28, 2016, defendant and the prosecutor appeared before the trial court. The court stated that it was going to have defendant evaluated because the court was "concerned about [defendant's] mental health" and defendant "indicated to the Clerk's Office that [he was] feeling suicidal and [the court] can't have that." The court further addressed defendant, "I want to get to the bottom of it. And if it's a matter of making sure that you're medicated or whatever it is, it's not good for you and I don't want anything to happen." The following colloquy then occurred.

                "DEFENDANT: No. The thing is I felt my rights were violated because I have the

3

right to have a second chair while I'm going pro se and I feel that you're working with the State.

THE COURT: I'm not working with anybody, sir. *** You're not getting a second chair. If you want to represent yourself, you can represent yourself ***. I begged you not to since the day we met.

DEFENDANT: Cause the thing is that every time I go to court the thing is that I want [you] to hear my motion – you don't want to hear it.

THE COURT: You sent a letter indicating publicly that you are suicidal –

DEFENDANT: I want a second chair.

THE COURT: That you are unbalanced.

DEFENDANT: I also wrote to Toni –

THE COURT: Toni Preckwinkle?

DEFENDANT: Yes. I also wrote to Kathy DeTwine (phonetic) that's the rep at general counsel.

THE COURT: I am glad to hear that. As I said, Tim, Ms. Preckwinkle and everybody in the county would tell you I think the same thing I'm telling you which is you need a competent attorney to represent you. Nobody is going to not tell you that. You're making a strategic error by trying to represent yourself.

DEFENDANT: Because there's no evidence. I'm here for a case I didn't commit.

THE COURT: Anyway I've ordered a BCX."

¶ 8    The case was continued to September 8, 2016, and defendant objected to the next court date because he felt "that's a long court date." The court explained that it was allowing time for the BCX because "you indicated that you wanted to kill yourself." Defendant responded,

4

"Because I want a new judge." Defendant then complained that the court did not want to hear his motions. Defendant stated, "You're making a terrible mistake by giving me a psyche eval for no reason." The court responded that defendant had written a letter. Defendant interjected, "Because I want a new judge because I feel that I'm not being treated well. I feel that I am not being treated well as going pro se." The court told defendant, "Right now the only thing I care about is your well being." At the conclusion of the hearing, the court stated, "For the record the Defendant as he was leaving was profane. I'm not going to hold him in contempt. He's got psychiatric issues."

¶ 9     The trial court conducted a fitness hearing on September 20, 2016. Both parties waived opening statements. The State called Dr. Melanie Venable, a staff psychiatrist at the forensic clinical services of the circuit court of Cook County. She met with defendant pursuant to a court order on August 30, 2016. She previously met with defendant on July 2, 2015. Dr. Venable found defendant fit to stand trial with medications following the prior evaluation.

¶ 10    For the August 2016 evaluation, Dr. Venable reviewed several records, including, police department reports, criminal history report, prior forensic clinical services psychological and psychiatric summaries dating to 2004, psychosocial history prepared by a social worker, and the Cermak Health Services medication profile. Defendant reported 12 hospitalizations over the prior 18 years. Defendant had previously been diagnosed with depressive disorder, intermittent explosive disorder, mental retardation, mood disorder, borderline intellectual functioning antisocial personality traits, and malingering.

¶ 11    The evaluation interview lasted approximately one hour. Defendant was "calm and cooperative." He greeted the doctor appropriately and "displayed adequate grooming." Dr. Venable described defendant's "psychomotor behavior" as "normal without any sort of ticks or

tremors," "[h]is speech was fluid with normal rate and volume," "his affect or emotional expression was within normal limits" and "his thought form was organized and he denied thoughts of harm to self or others." Defendant did not "appear to be experiencing any perceptual disturbances such as auditory or visual hallucinations," and he appeared to be "cognitively intact." Defendant's demeanor "compared favorably" with his prior evaluation in 2015.

¶ 12     Dr. Venable discussed the nature of the charges with defendant and defendant indicated an understanding of the charges by giving a detailed listing of each charge in both the present case and the other pending case. He indicated an understanding of the difference between a felony and a misdemeanor. Defendant also expressed an understanding of the difference between a plea and proceeding to trial as well as the difference between a jury and a bench trial. Defendant further understood the roles of courtroom personnel. Dr. Venable stated that when she asked if defendant might be at a disadvantage by representing himself, he replied, " 'I understand the law. I ain't worried about it.' "

¶ 13     Defendant responded appropriately to her questions. Dr. Venable diagnosed defendant with "an unspecified depressive disorder in remission." Defendant denied experiencing any symptoms of a mental disorder. She stated that he was currently taking an antidepressant as well as a sleep aid. Defendant denied experiencing any depressive symptoms, such as loss of interest, suicidal ideation, sleep disturbance, and psychotic and auditory disturbances. When asked if defendant's depressive disorder would affect defendant's fitness, the doctor answered, "It could." Dr. Venable did not believe defendant was malingering. In Dr. Venable's opinion, "[w]ithin a reasonable degree of medical and psychiatric certainty my opinion is that the defendant is fit to stand trial with medications.

¶ 14     Defendant did not cross-examine Dr. Venable and did not present any witnesses. The

parties rested after the doctor's testimony.

¶ 15    Dr. Erick Neu, a licensed clinical psychologist with forensic clinical services, also evaluated defendant. Dr. Neu did not testify at the fitness hearing, but his letter, dated August 1, 2016, with his findings was filed with the court in September 2016. Dr. Neu evaluated defendant on August 1, 2016. Based on the results of the examination and to a reasonable degree of psychological and scientific certainty, Dr. Neu found defendant fit to stand trial and legally sane at the time of the alleged offense. Dr. Neu found defendant was "not suffering from a mental condition that would compromise his ability to understand the nature of the proceedings against him or to assist in his defense."

¶ 16    The parties waived closing arguments. Defendant then requested "to withdraw my motion to quash and suppress evidence of arrest" and demanded a "jury trial without any continuance." Before addressing defendant's request, the trial court found defendant fit to stand trial with medication. The court then discussed defendant's request and allowed defendant to withdraw his motion.

¶ 17    The following evidence was presented at defendant's April 2017 jury trial.

¶ 18    J.H. testified that in May 2014, she was 18 years old. She used a social media website called Tagged and, on the website, she began to communicate with a man named Maurice Jordan. Eventually she gave Jordan her phone number and they communicated via the telephone. J.H. agreed to meet the man in person. On June 10, 2014, she took a bus from Wisconsin to Chicago with a plan to meet the man at Union Station. When she arrived at Union Station, she went to Canal Street to meet Jordan, but she did not see the man pictured on Tagged. While she talked to the man she believed was Jordan, J.H. looked for him and observed one person using a phone outside the station. The man using the phone was not the same man in the photos of

7

Jordan. She identified defendant in court as the man she observed outside Union Station. J.H. stated that defendant did not look like Jordan and she was "disgusted." She met defendant and told him that she "didn't want to communicate or talk to him [any]more because it wasn't him in the picture." Both she and defendant then got on the Brown Line train and went their separate ways. She did not speak to defendant while on the train.

¶ 19     J.H. continued to receive texts and phone calls from defendant, but she did not respond. She later agreed to meet with defendant so she could tell him in person to leave her alone. On June 15, 2014, she agreed to meet defendant near the Clark and Division Red Line station at around 5 to 5:30. When she reached that location, she went with defendant to his apartment, which was approximately a block away on Division Street. Defendant's apartment was on the first floor and when she entered, J.H. observed several photographs of nude and semi-nude women on the walls. She then used the bathroom.

¶ 20     When she exited the bathroom, she told defendant to leave her alone. Defendant then put his hand on her neck and pushed her onto his bed. J.H. described feeling pain in her neck and being unable to speak. Defendant used his other hand to pull down J.H.'s leggings and then remove his own pants. Defendant then forced his penis into J.H.'s vagina, he ejaculated, and removed his penis. J.H. then pulled up her leggings and left without saying anything. Defendant asked her where she was going and started to follow her to the Red Line station. When she got to the station, she looked around and saw that defendant was no longer following her.

¶ 21     J.H. then called her grandparents to ask her grandfather what to do. He told her to call 911, which she then called. An ambulance came and took her to Mary of Nazareth Hospital. At the hospital, J.H. consented to having a rape kit examination of her body, which included taking her clothing, a physical examination, and medications for sexually transmitted diseases. She

8

stated that she had bruises on her neck, which she did not have prior to the assault by defendant. She also described pain in vagina.

¶ 22    J.H. then went to a police station where she spoke with a Chicago police detective. He asked her to view a physical lineup and she agreed. J.H. viewed the lineup and identified defendant.

¶ 23    On cross-examination, defendant asked J.H. if she had told police that they were in a relationship, and she denied that statement. Defendant then asked her why there was an outbound phone call from her phone to his phone around the same time as the assault. J.H. responded that it was because defendant was stalking her and would not leave her alone. Defendant asked J.H. "why didn't [she] block [defendant's] number to – from your phone." She responded, "You can't block him on a regular number, only on the iPhone." Defendant also asked, "why didn't [she] call the police and say somebody's harassing [her]." J.H. responded that she did not know.

¶ 24    Defendant asked J.H. about her statement that he choked her and asked if he could show her pictures. The trial court told defendant to pass the photographic exhibits to the deputy sheriff who would pass them to J.H. The photographs were of her injuries, which had been entered into evidence by the prosecutor. Defendant then asked J.H. if she saw choke marks, and she answered, "Yep, they're in the picture." Defendant next asked if she could see fingerprints in the pictures, and she answered no. Defendant continued to ask why there were no fingerprints if he choked her. The prosecutor objected and the trial court sustained the objection. The court then asked the State if there was any redirect, and when the prosecutor indicated no, J.H. was excused from the witness stand. Defendant did not make an objection or statement at the conclusion of her testimony.

¶ 25    Richard Kleinpass testified that J.H. was the biological granddaughter of his wife. He was

employed by the Chicago police department. On June 15, 2014, J.H. called his wife and asked to speak to him. He stated that she sounded "traumatized" and told him she had been sexually assaulted and asked him what she should do. She was "very nervous" and told him that the assault had "just happened" off the Red Line. Defendant declined cross-examination.

¶ 26    Tamara Jackson testified that she was a sexual assault nurse coordinator at St. Mary's and Elizabeth Medical Center and treated J.H. She performed the rape kit on J.H., which included a patient history for both law enforcement and patient safety. She wrote down J.H.'s narrative of the assault, which Jackson read into the record. Jackson described the rape kit as "a head-to-toe forensic examination."

> "Usually there's oral swabs that you can get. There's a finger stick swab to get their blood DNA. There's pelvic exam speculums that you get swabs from their vaginal area, their cervical area, their anal area and any miscellaneous swabs and any clothes. That's pretty much the steps of the kit."

¶ 27    Jackson clarified that J.H. did not describe anal penetration, but a swab is taken of the area for any drainage following vaginal intercourse. The kit was completed and sealed. Jackson did not observe any specific injuries, but J.H. complained of tenderness in her vaginal area. Jackson did not see any injuries on J.H.'s neck, but testified that bruising does not show initially but could develop over time.

¶ 28    Chicago Detective Andrew Perostianis testified that he was assigned to investigate the sexual assault of J.H. on June 16, 2014. He learned that a person was in custody and met with that person. He identified defendant in court as the person in custody. After he spoke with defendant, defendant was released that day because the police were waiting possible forensic DNA evidence to be examined by the Illinois State Police Crime Lab. In May 2016, he received

a report from an Illinois State Police forensic scientist regarding the DNA results. Based on those results, he placed defendant under arrest.

¶ 29    On cross-examination, defendant asked the detective whether defendant had been given his *Miranda* rights. The officer stated that he was not present when defendant was taken into custody in June 2014. He did not read defendant his *Miranda* rights because he did not ask defendant any questions. Defendant asked why it took so long for him to be rearrested in 2016, and Detective Perostianis responded that a DNA report from the crime lab varies in time. "It can take two months. It could take two years. It could take longer." Defendant continued to ask questions about his initial arrest in 2014. The detective explained that "[b]eing arrested and being charged are two different things." He decided to release defendant because he knew that he "would not get DNA results fast enough within the 72 hours to officially charge" defendant.

¶ 30    At the start of the second day of trial, defendant asked if he could recall J.H. as a witness. Defendant told the trial court that he realized the previous night that the phone records showed an outgoing call on J.H.'s phone between 5 p.m. and 7 p.m. Defendant admitted that he had the phone records at the time he cross-examined J.H. The court denied defendant's request, noting that defendant had "ample opportunity to examine her." The court also found the issue of the phone records to be "collateral, not germane particularly in light of the defense that's been asserted by [defendant] which was that he had nothing to do with her."

¶ 31    Jay Winters testified that he was employed as a forensic scientist with the Illinois State Police and was an expert in forensic biology and DNA analysis. Winters compared the DNA samples obtained from J.H., defendant, and the rape kit administered to J.H. Defendant's DNA was obtained from a buccal swab in September 2015. According to Winters's analysis of the DNA samples, a human female DNA profile was identified in vaginal swabs that matched J.H.'s

profile. A human male DNA profile was also identified in vaginal swabs that matched

defendant's DNA profile. The determination was made by comparing defendant's DNA profile

from the buccal swab to the DNA profile found in the vaginal swabs. Additionally, in Winters's

analysis of the anal swabs, a human female profile matched J.H. and a human male profile

matched defendant's DNA profile. The male DNA profile from the vaginal swabs matched the

male DNA profile from the anal swabs.

¶ 32    Winters testified that the human male DNA profile would be expected to occur in "in 1 in

32 quintillion Black, 1 in 66 quintillion White, or 1 in 17 quintillion Hispanic unrelated

individuals." In his opinion to a reasonable degree of scientific certainty, Winters opined that

defendant was the source of the human male DNA profile identified in the vaginal and anal

swabs of J.H.

¶ 33    Following this witness, the State rested its case. Defendant moved for a directed finding,

which the trial court denied.

¶ 34    Defendant testified on his own behalf. According to defendant, on June 10, 2014, he was

not in Chicago because he was studying to be a prep cook. He left in the morning and returned

that evening. He did not know how J.H. called his phone. He assumed that his friend Maurice

Jordan gave defendant's phone number to J.H. Jordan was staying at defendant's home because

of a dispute with his landlord and was using defendant's phone.

¶ 35    On June 15, 2014, Jordan was still staying with defendant. Defendant left the apartment

to "enjoy the weather" at the North Avenue beach. Both men left the apartment around 1 p.m.

Jordan using defendant's phone "talking with some woman arguing and stuff." The men then

"went our separate ways." Defendant eventually went to the Lakeview neighborhood before

starting to walk home around 6 p.m. He returned home around 7:30 to 8 p.m. He was going to

take a shower when someone knocked on his door. Defendant answered the door and saw police detectives at his apartment.

¶ 36    Defendant stated that the detective asked for his name and asked if he was Maurice Jordan. Defendant gave his name and showed them his identification. According to defendant, the detectives asked if anybody else came into his apartment and defendant told them no. Then the detective told defendant that somebody had identified him and there was a sexual assault investigation. The detective asked defendant if he knew J.H. and defendant said he did not. Defendant was handcuffed and taken to the police station. Defendant continued to deny his involvement in the sexual assault. Defendant was released the following day.

¶ 37    Defendant also testified that the phone records showed outgoing calls from J.H.'s phone from 5 to 6:50 p.m. which overlapped with J.H.'s statement that the assault happened between 5 and 5:30 p.m.

¶ 38    On cross-examination, defendant maintained that he did not know J.H. and she was calling his phone for Jordan. Defendant admitted that his middle name was Maurice. On June 15, 2014, defendant was 30 years old, 5 feet 8 inches tall, weighed about 230 pounds, walked with a limp from a recent injury, and wore his hair in dreadlocks with red tips. Defendant denied hanging the pictures of nude and semi-nude women on his apartment walls. Defendant asserted that he gave Jordan's address to the police.

¶ 39    The parties then presented two stipulations to the jury. The parties stipulated that (1) a police detective would testify that J. H. told him that she used the bathroom at defendant's apartment after she was sexually assaulted, and (2) phone records show communications between J. H.'s phone and defendant's phone. Defendant then rested his case. The State offered defendant's 2005 attempted armed robbery conviction as rebuttal evidence.

¶ 40    Following deliberation, the jury convicted defendant of one count of aggravated criminal sexual assault. In May 2017, the trial court appointed an attorney from the public defender's office to represent defendant in posttrial proceedings. In July 2017, defense counsel filed a motion to reconsider, or in the alternative for a new trial. At the next status hearing, the State requested a retrospective fitness hearing in response to defendant's posttrial motion. A fitness hearing was conducted in October 2017. Defense counsel objected to the hearing and argued that retrospective fitness hearings are "inherently problematic and may implicate due process concerns." Counsel also moved for a new trial. In denying defendant's motion for a new trial, the trial court stated that it never saw "any evidence of any sort of mental illness that would of [*sic*] obviate his ability (1) to represent himself, or (2) to be fit to stand trial ***."

¶ 41    The State then presented the following evidence. Dr. Nishad Nadkarni testified that he was employed as a staff forensic psychiatrist with the circuit court's forensic clinical services. Pursuant to the court's order, he examined defendant on September 14, 2017, to determine defendant's fitness to stand trial, fitness with medications, and retrospective fitness related to defendant's prior fitness hearing and the trial. Prior to the interview, Dr. Nadkarni reviewed multiple evaluations performed by the forensic clinical services department, defendant's medication profiles, police documentation and reports related to defendant's arrest, defendant's statement, and defendant prior medical records from Cermak Health Services. He learned that defendant has had 12 inpatient psychiatric hospitalizations.

¶ 42    Dr. Nadkarni stated that defendant has been diagnosed with "multiple diagnostic impressions including Bipolar disorder, schizoaffective disorder, unspecified depressive disorder, other mood disorder, as well as, malingering, antisocial personality traits, borderline intellectual functioning." When asked about defendant's prior diagnosis as malingering, Dr.

14

Nadkarni testified that defendant has "a history of disruptive and oppositional behaviors of affects, and as well suicidal threats and unwitnessed attempts of suicide with no bonafide [*sic*] objective evidence of any kind of major mental illness." According to Dr. Nadkarni, defendant's medical records are "replete with evidence" of defendant making "complaints psychiatrically, as well as, threatening suicide tin order to get secondary gain, which is the definition of malingering." Defendant had been prescribed an antidepressant for sleep purposes as well as a sedating antidepressant. Defendant reported to the doctor that he was not taking the sedating antidepressant at the evaluation.

¶ 43    During the interview, Dr. Nadkarni found that defendant

>"presented with no evidence of psychiatric or cognitive impairment. He was cooperative, he was polite, he was charismatic in his interpersonal relation which meant that he appeared very focused on what I was saying and answering appropriately to my questions.
>
>He showed a full range of affect or expression, he was very articulate, likely above average at least of intelligence."

¶ 44    Dr. Nadkarni discussed the charges with defendant and defendant understood the charge and its seriousness as well as "the consequences of being found not guilty versus guilty of that charge." Defendant also understood the difference between pleading guilty or not guilty and the process of plea bargaining. Defendant was also able to explain the difference between a jury and bench trial as well as the roles of courtroom personnel, including the prosecutor, defense counsel, and witnesses. Defendant further understood the sentencing range of the convicted offense. Defendant responded appropriately to Dr. Nadkarni's questions.

¶ 45    Dr. Nadkarni diagnosed defendant with antisocial personality disorder with narcissistic

traits, a history of malingering mental illness, and a seizure disorder. In Dr. Nadkarni's opinion, defendant was fit to stand trial retrospectively to the trial in April 2017, and defendant "was not exhibiting any signs or symptoms of major mental illness or cognitive impairment that would have precluded his comprehension of the nature of his charge, courtroom proceedings, as well as courtroom personnel, or impair his ability to assist counsel in his defense." Dr. Nadkarni further found that defendant was fit in September 2016 at the time of hist first fitness hearing.

¶ 46    On cross-examination, Dr. Nadkarni stated that during the interview, he did not observe any signs that defendant was bipolar, and additionally the doctor found no evidence that defendant was "having genuine symptoms that would suggest a major mental illness." Dr. Nadkarni explained that a person with a bipolar diagnosis has to have major depressive and manic mood episodes, and in defendant's case, there were no such episodes in defendant's records.

¶ 47    No additional witnesses testified at the hearing. A letter from Dr. Neu, dated August 29, 2017, was filed in the trial court. Dr. Neu examined defendant on August 21, 2017, and found, to a reasonable degree of psychological and scientific certainty, defendant was fit to stand trial, at the time of both his September 2016 fitness hearing and his April 2017 trial. Dr. Neu found that defendant "was *not* suffering from symptoms of a mental condition that would have significantly compromised his ability to understand the nature of the proceedings against him or to have rationally assisted in his defense." (Emphasis in original.)

¶ 48    Following arguments, the trial court found defendant was fit to stand trial. In its findings, the trial court opined:

> "Mr. Reliford from the first time that he arrived in this courtroom has evidenced, and this is based on my own observations, a level of malingering and

16

manipulation that I have seldom seen in my work here, and so I listened closely to Doctor Nadkarni today because it encapsulated or summarized a lot of my interactions with Mr. Reliford.

The State correctly points out, and I think that even the Defense points out that I encouraged Mr. Reliford extensively to not choose a path in which [he] represented himself. I did it aggressively, and I did it over and over again.

In none of those interactions did he ever evidence any mental illness whatsoever, and then one day a year or two ago I received a letter indicating that he's going to kill himself. His housing situation changed because everyone became concerned about Mr. Reliford, and then almost immediately once the housing situation became not to his liking he came in here every day from month to month and asked that his housing be changed.

He manipulated that. He has endeavored to manipulate the court system and this particular court at every turn. He manipulates his attorneys, he cast aspersions against them regarding their representation of him. There isn't one aspect of his representation that was that indicates any mental illness.

It might have been kind of poor choosing, but these are all circumstances and realities that Mr. Reliford created for himself. It's nothing other and any reviewing court that looks at this it's nothing than an effort on his part to muddy the water."

¶ 49    The court then considered and denied defendant's posttrial motion. The court subsequently sentenced defendant to a term of 16 years in the Department of Corrections. Defendant moved to reconsider his sentence, which the court denied.

¶ 50    This appeal followed.

¶ 51    On appeal, defendant first argues that the trial court erred in allowing defendant to represent himself at the initial fitness hearing in 2016. According to defendant, the court refused to appoint counsel despite its concerns about defendant's mental health and thus, defendant's first fitness hearing could not be considered adversarial. The State maintains that the trial court properly permitted defendant to proceed *pro se* at the pretrial fitness hearing.

¶ 52    "It is well established that the sixth amendment to the United States Constitution guarantees an accused in a criminal proceeding both the right to the assistance of counsel and the correlative right to proceed without counsel." *People v. Haynes*, 174 Ill. 2d 204, 235 (1996) (citing *Faretta v. California*, 422 U.S. 806, 833-34 (1975)). "The right of self-representation is 'as basic and fundamental as [the] right to be represented by counsel.' " *Id.* (quoting *People v. Nelson*, 47 Ill. 2d 570, 574 (1971)).  A defendant has the constitutional right to self-representation. *Faretta*, 422 U.S. at 834. "Although a court may consider the decision unwise, a defendant's knowing and intelligent election to represent himself must be honored out of ' "that respect for the individual which is the lifeblood of the law." ' " *Haynes*, 174 Ill. 2d at 235 (quoting *People v. Silagy*, 101 Ill. 2d 147, 180 (1984), quoting *Illinois v. Allen*, 397 U.S. 337, 350-51 (1970) (Brennan, J., concurring)); see also *People v. Kidd*, 178 Ill. 2d 92, 104 (1997) (citing *People v. Lego*, 168 Ill. 2d 561, 564 (1995)). "Before a court accepts a waiver of counsel, it must determine that the defendant is competent to stand trial and that the waiver of counsel has been knowingly and voluntarily made." *People v. Harris*, 2013 IL App (1st) 111351, ¶ 79 (citing *Godinez v. Moran,* 509 U.S. 389, 400 (1993)). In connection with allowing a defendant to proceed *pro se*, the trial court must determine that the defendant understands the nature of the charge, the minimum and maximum sentence proscribed by law, and that he has a right to have

counsel appointed if he is indigent. Ill. S. Ct. R. 401(a) (eff. July 1, 1984). Defendant does not

contest that the trial court fully complied with Supreme Court Rule 401. "The trial court's

decision on a defendant's election to represent herself will be reversed only if the court abused

its discretion." *People v. Shelton*, 401 Ill. App. 3d 564, 574 (2010).

¶ 53    Defendant contends that the trial court abused its discretion by failing to appoint counsel

until a determination was made regarding defendant's fitness. In the trial court, defendant waived

his right to counsel at the start of the proceedings and chose to represent himself. However,

during pretrial proceedings, defendant sent a letter to the clerk of the circuit court in which he

threatened suicide. Specifically, defendant's letter stated, "this is a suicide letter that says if he

doesn't receive a change of venue & be treated fairly by the next court date of 07-28-16, then he

will seriously end his life." The letter continued by stating that the trial judge "disrespected"

defendant and violated defendant's due process rights by declining to appoint a second chair to

assist defendant. Defendant also complained of the judge's failure to hear defendant's motions

and defendant believed that the judge and assistant State's Attorney (ASA) were "working

together to convict him ***." Defendant asserted that he "doesn't need a psych evaluation at all."

After the trial court was informed of the letter, the court ordered a BCX and fitness hearing

because defendant had threatened suicide. The court did not appoint counsel to represent

defendant during the fitness hearing.

¶ 54    A defendant is presumed to be fit to stand trial. 725 ILCS 5/104-10 (West 2016). Due

process bars the prosecution of an unfit defendant. *People v. Hanson*, 212 Ill. 2d 212, 216

(2004). A defendant is unfit to stand trial if, due to a mental or physical condition, he or she is

unable to understand the nature and purpose of the proceedings or to assist in the defense. *People

v. Brown*, 236 Ill. 2d 175, 186 (2010); 725 ILCS 5/104-10 (West 2016). "Fitness speaks only to a

person's ability to function within the context of trial; it does not refer to sanity or competence in other areas." *People v. Coleman*, 168 Ill. 2d 509, 524 (1995). "Competence to waive counsel is measured by the same standard as competence to stand trial." *Id*. The issue of the defendant's fitness for trial, or to be sentenced may be raised by the defense, the State, or the Court at any appropriate time before, during, or after trial. 725 ILCS 5/114-11(a) (West 2016).

¶ 55    "A fitness examination order is not evidence of a *bona fide* doubt as to the defendant's fitness." *People v. Garcia*, 2015 IL App (1st) 131180, ¶ 51 (citing *People v. Hill*, 345 Ill. App. 3d 620, 627 (2003)). "Evidence at a fitness hearing may include a report from forensic clinical services, or from private psychiatrists or psychologists retained by either side, but the court must make the ultimate decision as to the defendant's fitness, not the experts." *Id*. ¶ 52. "Courts determine fitness by considering 'the defendant's irrational behavior, the defendant's demeanor at trial, and any prior medical opinion on the defendant's competence' to stand trial." *Id*. (quoting *People v. Harris*, 206 Ill. 2d 293, 304 (2002)).

¶ 56    According to defendant, "the trial court allowed defendant to represent himself despite it insisting that he was 'unbalanced' and had 'psychiatric issues.' " However, a complete review of the record in this case discloses that the trial court never expressed a *bona fide* doubt as to defendant's fitness. Instead, the trial court specifically stated that it never "saw any evidence of any sort of mental illness." Rather, the record demonstrates that defendant attempted to manipulate the trial court by threatening suicide to achieve what he wanted and two remarks out of context fail to establish any error.

¶ 57    The court's reference to defendant as "unbalanced" occurred when the trial court ordered the BCX following defendant's letter threatening suicide. The court stated, "You sent a letter indicating publicly that you are suicidal *** that you are unbalanced." Defendant interrupted the

court in the middle of the court's statement, but it is clear that the reference to defendant being "unbalanced" was part of the court's description of defendant's letter. The court was not making its own observation as to defendant's mental health, but was discussing defendant's letter. The court did express its concern about defendant's mental health based on the letter.

> "I have a request. I'm going to have you evaluated. I'm concerned about your mental health. BCX ordered. You indicated to the Clerk's Office that you're feeling suicidal and I can't have that. I want to get to the bottom of it. And if it's a matter of making sure that you're medicated or whatever it is, it's not good for you and I don't want anything to happen to you."

¶ 58    Defendant responded that the letter was written because he felt his rights were being violated, he wanted a second chair, and he felt the court was working with the State. Later in the hearing, defendant asserted that the court was "making a terrible mistake by giving [him] a psych[] eval for no reason." The court responded that the evaluation was based on defendant's letter.

¶ 59    The reference to defendant's "psychiatric issues" took place at the end of the hearing. At the conclusion of the hearing, the trial court stated, "For the record the Defendant as he was leaving was profane. I'm not going to hold him in contempt. He's got psychiatric issues." Neither of these statements indicated that the trial court had found that a *bona fide* doubt existed as to defendant's fitness. Rather, as the record shows, the court ordered an evaluation and fitness hearing as a precaution after defendant sent a letter threatening suicide if he did not receive certain demands related to his trial. Defendant admitted to the court that the letter was intended to obtain relief because he wanted a new judge and he felt he "was not being treated well as going pro se."

¶ 60    Defendant cites *People v. Rath*, 121 Ill. App. 3d 548 (1984), for support, but we find that case distinguishable from the present circumstances. In that case, the defendant had waived counsel, but during pretrial proceedings, he had "claimed to be the royal son of the Sultan of Turkey and Ethel Barrymore, a diplomat with immunity from prosecution, a doctor and an attorney." *Id*. at 549. The trial court expressed a *bona fide* doubt as to the defendant's fitness to stand trial and ordered a fitness hearing. Over the defendant's objection, the court appointed a public defender to act as standby counsel through the fitness hearing. *Id*. During the hearing, the defendant refused any assistance from the public defender. *Id*. At the conclusion, the jury determined the defendant was not fit to stand trial and the defendant appealed the finding that he was unfit to stand trial. *Id*. at 550.

¶ 61    On appeal, defense counsel argued that "it was error under the facts of this case to permit the defendant to waive counsel when it was apparent that there was a *bona fide* doubt of the defendant's mental ability to make a valid waiver." *Id*. The reviewing court concluded:

> "the circuit court correctly believed that a bona fide doubt existed as to defendant's fitness to stand trial. Having properly declared that such a doubt existed, the court then erred in allowing the defendant to represent himself. Until the shadow of defendant's questioned ability to understand the nature of the charges against him and his ability to cooperate in his own defense was removed, he was not only entitled to be represented by competent counsel, it was required, even if against his will." *Id*. at 551.

¶ 62    In contrast, defendant in the present case was found fit to stand trial following the BCX interview by Dr. Venable. Unlike the defendant in *Rath*, defendant did not exhibit such behavior in court as to warrant the trial court to have a *bona fide* doubt as to his fitness. Here, the trial

court exercised its discretion to allow defendant to represent himself at the fitness hearing and denied defendant's request for standby counsel. As the court observed at the posttrial retrospective fitness hearing, defendant "from the first time that he arrived in this courtroom has evidenced, and this is based on my own observations, a level of malingering and manipulation that I have seldom seen in my work here." The court also stated that it never saw "any evidence of any sort of mental illness that would of obviate his ability (1) to represent himself, or (2) to be fit to stand trial."

¶ 63    Given the trial court's statements on the record, it is clear that the court did not have a *bona fide* doubt about defendant's fitness when the pretrial fitness hearing was ordered. Accordingly, the trial court did not abuse its discretion in allowing defendant to represent himself at the fitness hearing.

¶ 64    Next, defendant asserts that trial court erred in finding defendant fit to stand trial and to represent himself at trial. Specifically, defendant contends that based on defendant's mental health history as well as defendant's inability to understand pretrial rulings, a *bona fide* doubt as to his mental fitness was raised and the court failed to act in response to defendant's behavior. The State responds that defendant was found fit to stand trial by three mental health professionals, Drs. Venable, Neu, and Nadkarni, and the court properly found defendant fit and properly permitted defendant to represent himself at trial.

¶ 65    As previously stated, a defendant is presumed to be fit to stand trial. 725 ILCS 5/104-10 (West 2016). A defendant is unfit to stand trial if, due to a mental or physical condition, he or she is unable to understand the nature and purpose of the proceedings or to assist in the defense. People v. Brown, 236 Ill. 2d 175, 186 (2010); 725 ILCS 5/104-10 (West 2016). Relevant factors which a trial court may consider in assessing whether a *bona fide* doubt of fitness exists include

(1) the defendant's irrational behavior, (2) the defendant's demeanor at trial, (3) any prior medical opinion on the defendant's competence, and (4) any representations by defense counsel on the defendant's competence. *Id*. at 186-87 (citing *People v. Eddmonds*, 143 Ill. 2d 501, 518 (1991)). "No fixed or immutable sign, however, invariably indicates the need for further inquiry on a defendant's fitness." *Id*. at 187 (citing *Eddmonds*, 143 Ill. 2d at 518). Rather, the question is "often a difficult one implicating a wide range of manifestations and subtle nuances." *Id*. A *bona fide* doubt arises where there are facts in existence that raise a "real, substantial and legitimate doubt as to [defendant's] mental capacity to meaningfully participate in his defense and cooperate with counsel." *Eddmonds*, 143 Ill. 2d at 518. "A defendant's limited intellectual ability, without more, does not render him unfit to stand trial." *Johnson*, 183 Ill. 2d at 194. The trial court's ruling on the issue of fitness will be reversed only if it is against the manifest weight of the evidence. *People v. Burton*, 184 Ill. 2d 1, 13 (1998).

¶ 66     " 'Fitness speaks only to a person's ability to function within the context of a trial. It does not refer to sanity or competence in other areas. A defendant can be fit for trial although his or her mind may be otherwise unsound.' " *Garcia*, 2015 IL App (1st) 131180, ¶ 52 (quoting *People v. Easley*, 192 Ill. 2d 307, 320 (2000)).

¶ 67     Defendant argues that the interval of four months between the trial and the retrospective fitness hearing was problematic because Dr. Nadkarni's diagnosis for the retrospective fitness hearing differed from Dr. Venable's diagnosis for the pretrial fitness hearing. However, both psychiatrists found defendant fit to stand trial. As the Illinois Supreme Court has observed, "retrospective fitness hearings are now the norm." *People v. Mitchell*, 189 Ill. 2d 312, 339 (2000). The passage of time is not dispositive, though the supreme court has observed that "the delay in conducting the hearing would exceed a year, however, the difficulties associated with

retrospective fitness determinations are more problematic." *People v. Neal*, 179 Ill. 2d 541, 553 (1997).

¶ 68    Here, a fitness hearing was conducted approximately eight months prior to trial. At the hearing, Dr. Venable testified that in her opinion, defendant was fit to stand trial with medications. She testified that defendant's medical records showed previous diagnoses for:

> "depressive disorder, not otherwise specified; intermittent explosive disorder; mental retardation; mood disorder, not otherwise specified with psychotic features; borderline intellectual functioning antisocial personality traits and malingering."

¶ 69    Dr. Venable observed that at the time of her examination, defendant was taking psychotropic medication, *i.e.*, an antidepressant and a sleep aid. She stated that defendant had been found fit prior fitness hearings. During the interview, defendant was appropriate and cooperative. He understood the charges against him as well as basic legal procedures in the courtroom. She diagnosed defendant with an "unspecified depressive disorder in remission." Dr. Venable did not find defendant to be malingering.

¶ 70    Dr. Neu also provided a report in which he found defendant fit to stand trial and was not suffering from a mental condition that would compromise his ability to understand the nature of the proceedings against him or to assist in his defense.

¶ 71    A retrospective fitness was conducted approximately four months after defendant's trial at the State's request in response to defendant's motion for a new trial. Dr. Nadkarni testified that in his opinion, defendant was fit at the time of his prior fitness hearing and at the time of his trial. Dr. Nadkarni indicated that defendant was malingering based on defendant's history of "disruptive and oppositional behaviors" as well as "suicidal threats and unwitnessed attempts of

suicide with no bonafide [*sic*] objective evidence of any kind of major mental illness." Specifically, he testified that defendant's records showed notes in which defendant was " 'very vague about depressive symptoms, attention seeking constantly seems manipulative.' " Dr. Nadkarni further testified that defendant's records were "replete" with evidence of defendant making psychiatric complaints, "as well as, threatening suicide in order to get secondary gain, which is the definition of malingering." He stated that defendant was prescribed two antidepressants, but defendant reported that he was not taking one of the medications at the time of the evaluation. At this interview, defendant again presented appropriately and was able to explain and discuss the charges against him as well as the courtroom procedures. Defendant told the doctor the specific sentencing range for his conviction.

¶ 72     Dr. Nadkarni diagnosed defendant with antisocial personality disorder with narcissistic traits, a history of malingering mental illness, and a seizure disorder. He testified that these disorders would not affect defendant's fitness.

¶ 73     Dr. Neu again examined defendant and submitted a report finding defendant fit and that defendant "was *not* suffering from symptoms of a mental condition that would have significantly compromised his ability to understand the nature of the proceedings against him or to have rationally assisted in his defense." (Emphasis in original.)

¶ 74     At the conclusion of the hearing, the trial court found defendant to be fit. In its findings, the trial court stated that it observed "a level of malingering and manipulation" that it had seldom seen. The court observed that Dr. Nadkarni's findings "encapsulated or summarized a lot of" its interactions with defendant. The court detailed that defendant "never evidenced" any signs of a major mental illness in court. The court found defendant to have engaged "in really profoundly manipulative behaviors in court."

26

¶ 75      We find nothing problematic with the retrospective fitness hearing occurring approximately four months after the trial. While the psychiatrists offered slightly different diagnoses, both testified consistently that defendant was cooperative and appropriate. He demonstrated his understanding of basic courtroom procedures and the charges brought against him as well as the requisite punishment. The trial court presided over both fitness hearings as well as all trial proceedings. The court found defendant to be fit both times and explicitly stated that it never observed any indication of mental illness such that defendant was unfit for trial. The findings of all three examining doctors as well as the trial court's own interactions with defendant support the court's conclusion.

¶ 76      Defendant attempts to bolster his claims that he was unfit by pointing to a few instances before the court which defendant claims demonstrate his "obvious lack of capacity to understand the proceedings." Specifically, defendant asserts that he "demonstrated an inability to understand the questions he was asked or articulate a logical point in his defense leading up to trial. For this assertion, defendant cites two pages in the record; the first was the opening of his first fitness hearing and the second citation was to the cover page for the day the jury trial began. Neither page showed any confusion or failure to understand a question by defendant and do not support his argument. Next, defendant points to a pretrial hearing on a motion *in limine* where the State moved to bar defendant from discussing his possible punishment before the jury. Defendant did not understand the motion and asked if he would "receive more punishment?" The court then explained what the State was arguing, and defendant responded, "I'm going to agree for me to talk to the witnesses and stuff." The court clarified that it was not saying defendant could not talk to the witnesses. Defendant then agreed to the motion. Defendant also points to a pretrial discussion in which the State reminded the court of its motion *in limine* regarding the rape shield

law. The court advised defendant that he would have to honor the prior orders about what he could and could not bring up with the victim. Defendant responded, "Yes. So you say I can bring more evidence on my part, right?" The court clarified, "That's not at all what I said. There is an order regarding rape shield, raising certain things with the victim." The court asked defendant if he understood and defendant responded that he did.

¶ 77     In addition to these isolated instances, defendant contends that he appeared paranoid by accusing the trial court of acting with the prosecutor to convict him and doubted the court's ability to be impartial. Defendant also claims that defendant "nonsensically" asserted that he never met J.H. despite the DNA evidence against him, rather than pursue a consent defense.

¶ 78     Contrary to defendant's argument, none of these instances suggested a *bona fide* doubt as to his fitness. His failure to understand legal points or to pursue a meritless defense reflect his lack of legal training and expertise, not his fitness. Defendant decided to represent himself at trial and his lack of understanding of legal representation did not raise a question as to his fitness. A defendant is unfit to stand trial if, due to a mental or physical condition, he or she is unable to understand the nature and purpose of the proceedings or to assist in the defense. *Brown*, 236 Ill. 2d at 186; 725 ILCS 5/104-10 (West 2016). Defendant clearly understood the nature and purpose of the proceeding and was able to assist in his defense. Defendant was evaluated both before and after the trial and found fit to stand trial by three mental health professionals. The trial court heard the testimony at these hearings and observed defendant throughout the proceedings before finding defendant fit at both hearings. Based on our review of the record, we find that the trial court's finding was not against the manifest weight of the evidence.

¶ 79     Defendant next contends that the trial court erred when it refused to allow him to approach J.H. during her trial testimony. Specifically, defendant asserts that he was "inherently

prejudiced" when the court refused to allow him to approach J.H. with a photograph of her injuries. Instead, the court asked defendant to pass the photograph to the courtroom deputy who would hand the photograph to J.H. According to defendant, the court improperly restrained his movement and made it appear "as if he was dangerous in front of the jury, denying the Defendant his presumption of innocence." The State maintains that the trial court acted well within its discretion by asking defendant to hand exhibits to the deputy. "Decisions regarding security and safety in the courtroom are squarely within the discretion of the trial court." *People v. Peeples*, 205 Ill. 2d 480, 531 (2002). "The determination of whether and how to restrain a defendant is left to the discretion of the trial court, and a reviewing court examines whether the trial court has abused that discretion." *People v. Allen*, 222 Ill. 2d 340, 349 (2006). Further, a trial court maintains broad discretion to oversee his or her courtroom and in maintaining the progress of a case. *People v. Coleman*, 183 Ill. 2d 366, 387 (1998).

¶ 80    During defendant's cross-examination of J.H., the following colloquy occurred.

> "DEEFENDANT: Is it okay if I show you pictures?
>
> THE COURT: Mr. Reliford, I'm going to – I'm not going to -- because of the unique circumstances of the case, I'm going to ask that you pass the evidence off to the deputy sheriff, and he'll -- show him what you want to do with the exhibit.
>
> PROSECUTOR: Judge, I believe that the pictures that he has have already been marked and entered into evidence.
>
> THE COURT: That may be the case.
>
> You can use their exhibits, too, Mr. Reliford
>
> DEFENDANT: Okay.
>
> ***
>
> DEFENDANT: May I show her –

THE COURT: You're not approaching her; no, sir. But you can hand it to the deputy sheriff, and you can ask her a question about that picture."

¶ 81    In support of his argument, defendant relies on cases in which a defendant was placed in shackles or ordered to wear a stun belt. See *Allen*, 222 Ill. 2d 340 (the defendant wore an electronic stun belt during the jury trial); *People v. Boose*, 66 Ill. 2d 261 (1977) (the defendant appeared in shackles during the jury trial). We find defendant's reliance on this line of cases to be misplaced. Defendant concedes that factors set forth by the supreme court to consider before imposing physical restraints on a defendant are not applicable in this case. We are not persuaded by defendant's attempt to liken passing a photographic exhibit to the victim with the deputy as an intermediary to physical restraint, such as shackles.

¶ 82    Illinois Supreme Court Rule 341(h)(7) requires an appellant to include in its brief an "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018). It is well-settled that a contention that is supported by some argument but does not cite any authority does not satisfy the requirements of Rule 341(h)(7), and bare contentions that fail to cite any authority do not merit consideration on appeal. *Wasleff v. Dever*, 194 Ill. App. 3d 147, 155-56 (1990). Arguments unsupported by citation to relevant legal authority are considered as forfeited on appeal. *Id.* Defendant has failed to cite any relevant authority to support his argument that the trial court improperly restrained him by asking him to pass an exhibit to the deputy.

¶ 83    Further, the State argues that the trial court acted consistently with the Rights of Crime Victims and Witnesses Act (725 ILCS 1320/1 *et seq.* (West 2016)), which details the rights and protections in place for victim witnesses like J.H. Under section 4(a), crime victims have several

rights, including "[t]he right to be treated with fairness and respect for their dignity and privacy and to be free from harassment, intimidation, and abuse throughout the criminal justice process" (725 ILCS 120/4(a)(1) (West 2016)) and "[t]he right to be reasonably protected from the accused through the criminal justice process" (725 ILCS 120/4(a)(7) (West 2016)).

¶ 84    Here, it was the trial court's decision to consider the security and safety protocols for its courtroom. Defendant was permitted to cross-examine J.H., and the photographic exhibit was passed to J.H. by the deputy. Defendant was not physically restrained, nor was he restrained from questioning J.H. about the exhibit. Therefore, we find the trial court acted well within its discretion to manage its courtroom. See *Peeples*, 205 Ill. 2d at 531; *Coleman*, 183 Ill. 2d at 387."offer of

¶ 85    Finally, defendant argues that the trial court violated his sixth amendment rights by terminating his cross-examination of J.H. and by refusing to allow defendant to recall her on the second day of the trial. The State maintains that the court properly (1) ended defendant's cross-examination when the questioning became repetitive and argumentative and (2) prohibited defendant from pursuing irrelevant interrogation.

¶ 86    "A criminal defendant has a fundamental constitutional right to confront the witnesses against him and this includes the right to conduct a reasonable cross-examination." *People v. Davis*, 185 Ill. 2d 317, 337 (1998). "The confrontation clause of the sixth amendment of the United States Constitution (U.S. Const., amend. VI) guarantees a defendant the right to cross-examine a witness against him for the purpose of showing the witness' bias, interest or motive to testify falsely." *People v. Harris*, 123 Ill. 2d 113, 144 (1988). "It is well established that a trial judge retains wide latitude insofar as the confrontation clause is concerned to impose reasonable limits on such cross-examination based on concerns about harassment, prejudice, confusion of

the issues, the witness' safety, or interrogation that is repetitive or of little relevance." *Id*. Thus,

" 'the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' "

(Emphasis in original.) *Id*. 144-45 (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)). "In the exercise of its discretion, a trial court may limit the scope of cross-examination, and its decision to do so will not be disturbed on appeal absent an abuse of that discretion." *In re Manuel M.*, 2017 IL App (1st) 162381, ¶ 17 (citing *People v. Enis*, 139 Ill. 2d 264, 295 (1990)).

¶ 87    In this case, defendant cross-examined J.H. about several topics, including whether she told the police they were in a relationship, why she called him the day of the assault, why she did not call the police if defendant was harassing her, why she went to a specific hospital, and about the injuries she testified she received during the assault. Defendant began asking J.H. about her injuries in a photograph and the following colloquy took place.

> "THE COURT: And the question that's before you right now, ma'am, is, do you see any choke marks?
>
> DEFENDANT: Like, fingerprints. Fingerprints. Because, like, you go and get choked–
>
> THE COURT: You've got to let her answer the questions you asked, Tim. You keep going on.
>
> The first question you asked was, do you see any choke marks; is that right?
>
> DEFENDANT: Right.
>
> THE COURT: That's the question for you, ma'am. Do you see any choke marks?
>
> THE WITNESS: No.
>
> THE COURT: I can't understand you.

THE WITNESS: No (unintelligible).

THE COURT: So what's your answer?

THE WITNESS: Yep, they're in the picture.

THE COURT: I can't understand you.

THE WITNESS: I said, yes, they're in that picture.

THE COURT: What's your next question?

DEFENDANT: Do you see any fingerprints, though?

PROSECUTOR: Objection to the form of the question.

THE COURT: Do you see –

That objection is overruled. Do you see fingerprints?

THE WITNESS: No.

DEFENDANT: So basically, you never were choked?

THE WITNESS: Yes, I was.

DEFENDANT: But there was no fingerprints.

THE COURT: That's sustained. Why are there no fingerprints is sustained.

DEFENDANT: Why was there no fingerprints saying that -- you say that – you testified that I choked you?

PROSECUTOR: Objection, Judge.

THE COURT: The objection is sustained.

Do you have redirect, State?

PROSECUTOR: No.

THE COURT: Thank you, ma'am.

(Witness excused.)"

33

Defendant did not object or make any statement when the trial court terminated his cross-examination.

¶ 88    When the trial resumed the next day, defendant asked to recall J.H. as a witness because he had a "new development." The court asked defendant what the new information was, and defendant informed the court that he noticed in J.H.'s phone records that there was an outbound call between 5 and 7 p.m. when the assault happened between 5 and 5:30 p.m. The court asked defendant if he had those records when he cross-examined J.H. and he admitted that he had them, but he did not notice until the previous night. The court denied defendant's motion to recall J.H. and observed that "the issue of the phone records is collateral, not germane particularly in light of the defense that's been asserted by [defendant] which was that he had nothing to do with her." The court also noted that the State did not introduce the phone records into evidence.

¶ 89    We find no abuse of discretion by the trial court in limiting defendant's cross-examination of J.H. As the record shows, defendant had been asking the same question about J.H.'s injuries and fingerprints multiple times. When he did not move to a new question after J.H. had answered, the trial court was within its discretion to foreclose further questions.

¶ 90    It was also within the court's discretion to deny defendant's request to recall J.H. Defendant admitted that he possessed the phone records before J.H.'s testimony, but he failed to timely review the records in order to question J.H. about them. We also note that defendant failed to cite any case law regarding his argument that he should have been permitted to recall J.H. as a witness.  As we previously discussed, Illinois Supreme Court Rule 341(h)(7) requires an appellant to include in its brief an "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record

relied on." Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018). It is well-settled that a contention that is supported by some argument but does not cite any authority does not satisfy the requirements of Rule 341(h)(7), and bare contentions that fail to cite any authority do not merit consideration on appeal. *Wasleff*, 194 Ill. App. 3d at 155-56.

¶ 91 Additionally, we point out that during cross-examination, defendant asked J.H. why she called him around the time that she said the assault occurred, and J.H. answered, "Because you were stalking me. You wouldn't leave me alone." The parties stipulated to the subscriber information, including telephone numbers, for both defendant and J.H. "Evidence is considered cumulative when it adds nothing to what was already before the fact finder." *People v. Maxey*, 2018 IL App (1st) 130698-B, ¶ 99. Therefore, any additional evidence defendant wished to add would have been cumulative.

¶ 92 Further, defendant did not make an offer of proof regarding what additional evidence he intended to obtain through J.H.'s testimony when recalled. "It is well recognized that the key to saving for review an error in the exclusion of evidence is an adequate offer of proof in the trial court." *People v. Andrews*, 146 Ill. 2d 413, 420-21 (1992). "The two primary functions of an offer of proof are to disclose to the trial judge and opposing counsel the nature of the offered evidence, enabling them to take appropriate action, and to provide the reviewing court with a record to determine whether exclusion of the evidence was erroneous and harmful." *People v. Thompkins*, 181 Ill. 2d 1, 10 (1998). The failure to make an adequate offer of proof results in forfeiture of the issue on appeal. *Andrews*, 146 Ill. 2d at 422. Absent an offer of proof, defendant has forfeited this claim on appeal.

¶ 93 Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 94    Affirmed.